# UNITED STATES DISTRICT COURT

### for the
### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | Case No. 2:24-MJ-05788 |
| | ) | |
| The premises located at 16178 Eastridge Court, Chino Hills, California 91709 | ) | |
| | ) | |

**FILED**
CLERK, U.S. DISTRICT COURT

09/23/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____GR_____ DEPUTY

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

*See Attachment A-1*

located in the Central District of California, there is now concealed:

*See Attachment B-1*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime; ☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1); 21 U.S.C. § 846; 21 U.S.C. § 843(b); 18 U.S.C. § 924(c); 18 U.S.C. § 1956 | Distribution of and PWID a controlled substance; Conspiracy to distribute and PWID a controlled substance; Unlawful use of a communication facility; Possession of firearm in furtherance of drug trafficking; Money laundering |

The application is based on these facts: *See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/
*Applicant's signature*

Special Agent Jaclyn Casaceli, Drug Enforcement Administration
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: September 23, 2024

*Judge's signature*

City and state: Los Angeles, California

Hon. Karen L. Stevenson, United States Magistrate Judge
*Printed name and title*

AUSA: Jeremy K. Beecher (x5429)

**ATTACHMENT A-1**

PREMISES TO BE SEARCHED

The premises located at 16178 Eastridge Court, Chino Hills, California 91709 ("SUBJECT PREMSISES 1"). SUBJECT PREMISES 1 is located on the West side of Eastridge Court. SUBJECT PREMISES 1 is further described as a two-story residence consisting of stucco exterior walls, with iron and stucco sided fencing enclosing the property, as is pictured below. SUBJECT PREMISES 1 includes all vehicles, storage facilities, outbuildings and garages within the curtilage of the SUBJECT PREMISES 1.





## ATTACHMENT B-1

### (SUBJECT PREMISES  1-4 and 6; the SUBJECT VEHICLE; SUBJECT PERSONS 1-4)

ITEMS TO BE SEIZED

1.    The items to be seized are the evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of cocaine, methamphetamine, and heroin), 21 U.S.C. § 846 (conspiracy to possess with intent to distribute and distribution of cocaine, methamphetamine, and heroin), 21 U.S.C. § 843(b) (unlawful use of a communication facility to facilitate distribution of Cocaine, methamphetamine, and heroin), 18 U.S.C. § 1956 (money laundering), and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses"), namely:

        a.    Cocaine, methamphetamine, and heroin;

        b.    Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of cocaine, methamphetamine, and heroin;

        c.    Firearms, ammunition, silencers, firearm parts and accessories, and items and/or material used to manufacture firearms;

        d.    Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

e.   Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances or firearms, or drug or firearms customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs, guns, or ammunition, were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

f.   Books, records, correspondence, ledgers, logs, journals, accounts payable and receivable, pay-owe sheets, contracts, letters and memoranda of agreements between potential co-conspirators, formulas, receipts, phone records, phone books, address books, notations and other papers, and any files relating to the transmission and exchange of cryptocurrency and/or other monetary instruments;

g.   Indicia of occupancy, residency, and/or ownership of the previously described property, premises, or vehicles, including utility and telephone bills, canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, envelopes, registration, receipts, and keys which tend to show the identities of the occupants, residents, and/or owners;

h.    Records concerning the use of commercial mail receiving agencies and/or post office boxes;

i.    Financial records, including bank statements, bank receipts, passbooks, bank checks, money market or similar accounts, money drafts, letters of credit, payroll documents, employer information, income and expense records, Federal and State income tax returns, money orders, cashier's checks, loan applications, credit card records, safe deposit box and records, acquisitions, notes, and records reflecting vehicles, aircraft or vessels owned, purchased, sold or leased;

j.    United States currency, and records relating to income derived from money laundering and expenditures of money and wealth, for example, money orders, wire transfers, cashier's checks and receipts, passbooks, cash cards, gift cards, checkbooks, check registers, securities, precious metals, jewelry, antique or modem automobiles, bank statements and other financial instruments, including stocks or bonds in amounts indicative of money laundering;

k.    Storage units and containers, such as floor safes, wall safes, upright safes (also known as gun safes), lock boxes, and other self-contained locked enclosures;

l.    Documents indicating travel in interstate and foreign commerce to meet with clients and/or co-conspirators, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills;

m.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

2.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

b.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the attachment of other devices;

d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.   evidence of the times the device was used;

f.   applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

g.   records of or information about Internet Protocol addresses used by the device.

3.    As used herein, the terms "records," "information,"
"documents," "programs," "applications," and "materials" include
records, information, documents, programs, applications, and
materials created, modified, or stored in any form, including in
digital form on any digital device and any forensic copies
thereof.

4.    As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

5.    As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

6.   As used herein, the term "digital devices" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communications devices, such as telephone paging devices, beepers, cellular telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

SEARCH PROCEDURE FOR DIGITAL DEVICES

7.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The

government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the scope of items to

be seized, the government will, as soon as is practicable,
return the device and delete or destroy all forensic copies
thereof.

       e.  If the search determines that a digital device
does contain data falling within the scope of items to be
seized, the government may make and retain copies of such data,
and may access such data at any time.

       f.  If the search determines that a digital device is
(1) itself an item to be seized and/or (2) contains data falling
within the scope of other items to be seized, the government may
retain the digital device and any forensic copies of the digital
device, but may not access data falling outside the scope of the
other items to be seized (after the time for searching the
device has expired) absent further court order.

       g.  The government may also retain a digital device
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),
including in circumstances where the government has not been
able to fully search a device because the device or files
contained therein is/are encrypted.

       h.  After the completion of the search of the digital
devices, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

      8.  The review of the electronic data obtained pursuant to
this warrant may be conducted by any government personnel

assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

9.    During the execution of this search warrant, law enforcement is permitted to:  (1) depress the holder's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the holder's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

10.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## <u>AFFIDAVIT</u>

I, Jaclyn Casaceli, being duly sworn, declare and state as follows:

### I.  <u>INTRODUCTION</u>

1.    I am a Special Agent with the Drug Enforcement Administration ("DEA"), United States Department of Justice, and am currently assigned to the St. Louis Division Office.  I have been employed by the DEA since June 2018, during which time I have specialized in investigations involving narcotics trafficking.  Prior to my assignment with the DEA, I was a Police Officer with the Cranston, Rhode Island, Police Department for approximately two years and a Police Officer with the Middletown, Rhode Island, Police Department for approximately three years.

2.    Upon joining the DEA, I completed 16 weeks of training in drug investigations and related legal matters at the DEA's Training Academy in Quantico, Virginia.  Coursework at the Training Academy included Drug Identification, Undercover Techniques, Tactical Training, Interview and Interrogation Techniques, and Legal Instruction.  Since then, I have received additional training in Cyber Investigations, Cryptocurrency tracing and Undercover Techniques.  While at the DEA, I have also personally participated in multiple narcotics investigations.

3.    Through my training and experience, I am familiar with the way in which narcotic traffickers conduct their business, including, but not limited to: the types and amounts of drugs

distributed; the types and amounts of profits made; the methods of importing and distributing controlled substances; the use of mobile telephones, email accounts, and the Internet to facilitate their transactions; and the use of numerical codes and code words to conduct their dealings.

4.    I have participated in investigations that have led to the issuance of search warrants involving violations of narcotic laws.  These warrants involved the search of locations including: residences of targets, their associates and relatives; "stash houses" (i.e., houses used as drug/money storage locations); storage facilities; cellular/camera phones; and computers.  Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized from the distribution and sale of controlled substances, and monetary instruments and various assets that were purchased with the proceeds of the drug trafficking.  I have participated in the execution of multiple federal search warrants.

## II. <u>PURPOSE OF AFFIDAVIT</u>

5.    This affidavit is made in support of a search warrant for the following premises, persons, and vehicle, which are further described in Attachments A-1 through A-11, for the items to be seized described in Attachments B-1 and B-2, which are the evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of cocaine, methamphetamine, and heroin), 21 U.S.C. § 846 (conspiracy to possess with intent to distribute and

distribution of cocaine, methamphetamine, and heroin), 21 U.S.C. § 843(b) (unlawful use of a communication facility to facilitate distribution of cocaine, methamphetamine, and heroin), 18 U.S.C. § 1956 (money laundering), and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses"):

      a.   The premises located at 16178 Eastridge Court, Chino Hills, California 91709 ("SUBJECT PREMISES 1"), believed to be the residence of Jimmy MAJEAU, as described more fully in Attachment A-1;

      b.   The premises located at 2552 Havenpark Avenue, South El Monte, California 91733 ("SUBJECT PREMISES 2"), believed to be a stash house utilized by MAJEAU and members of MAJEAU's drug trafficking organization (the "MAJEAU DTO"), as described in Attachment A-2;

      c.   The premises located at 2211 East Orangewood Avenue, Apartment 467, Anaheim, California 92806 ("SUBJECT PREMISES 3"), believed to be the residence of Eric HERNANDEZ, as described in Attachment A-3;

      d.   The premises located at 1235 South McBride Avenue, East Los Angeles, California 90022 ("SUBJECT PREMISES 4"), believed to be a secondary residence and stash location for HERNANDEZ, as described in Attachment A-4;

      e.   The premises located at 12010 Ramona Boulevard, Unit #1, El Monte, California 91732 ("SUBJECT PREMISES 5"), believed to be a stash location, facilitating money laundering for the MAJEAU DTO, as described in Attachment A-5;

f.    The premises located at 17548 East Orlon Drive, Rowland Heights, California 91748 ("SUBJECT PREMISES 6"), believed to be the residence of Andrea ALVAREZ, as described in Attachment A-6;

g.    The vehicle described as a 2021 white BMW model 840i, bearing California license plate number 9EZU530, with a vehicle identification number WBAGV2C07MCF98194 and a registered owner of Daniel Pantoja, 5253 1/2 Via Campo Street, Los Angeles, California (the "SUBJECT VEHICLE"), believed to be utilized by HERNANDEZ in furtherance of the Subject Offenses, as described in Attachment A-7;

h.    The person of MAJEAU ("SUBJECT PERSON 1"), as described in Attachment A-8;

i.    The person of HERNANDEZ ("SUBJECT PERSON 2"), as described in Attachment A-9;

j.    The person of Jonathan WARD ("SUBJECT PERSON 3"), as described in Attachment A-10; and

k.    The person of ALVAREZ ("SUBJECT PERSON 4"), as described in Attachment A-11.

6.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are

related in substance and in part only, all amounts or sums are
approximate, and all dates and times are on or about those
indicated.

### III. __SUMMARY OF PROBABLE CAUSE__

7.    Federal law enforcement agencies -- including the DEA,
the Bureau of Alcohol, Tobacco, Firearms and Explosives, and the
Internal Revenue Service -- are investigating the MAJEAU DTO's
distribution of illegal drugs, including large quantities of
cocaine and crystal methamphetamine, across the United States.
As discussed below, MAJEAU is believed to be the leader of this
drug trafficking conspiracy.  MAJEAU has been utilizing
commercial shipping entities including the United Parcel Service
("UPS") to distribute drugs across the United States and receive
drug proceeds.  Participants in the MAJEAU DTO include
HERNANDEZ, WARD, ALVAREZ, and others known and unknown to
distribute large quantities of illegal drugs.  As set forth
herein, law enforcement believes evidence, fruits, and
instrumentalities of violations of the Subject Offenses will be
found at SUBJECT PREMISES 1-6, in the SUBJECT VEHICLE, and on
the persons of MAJEAU, HERNANDEZ, WARD, and ALVAREZ.

### IV. __STATEMENT OF PROBABLE CAUSE__

8.    Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

    **A.**    **UPS Parcel Seizures in Missouri, Ohio and Maryland Containing Cocaine and Methamphetamine**

       1.    October 6, 2023 – Seizure of Two UPS Parcels in St. Louis, Missouri

9. On October 6, 2023, DEA St. Louis investigators seized two UPS parcels, purchased through UPS shipper account 5W07W5, containing a total of eight kilograms of suspected cocaine which had field tested positive for cocaine utilizing a TruNarc device. The parcels had destination addresses located in the Eastern District of Missouri with a shipper address of "EDD Shipping, 18009143538 Department, 6541 E Washington Blvd, Commerce, California 90040." During the investigation, law enforcement determined that HERNANDEZ was employed by UPS as a UPS driver based out of the Compton, California UPS Center. Furthermore, law enforcement determined that the shipper address was found to be a legitimate address along HERNANDEZ's UPS delivery route. The two parcels further contained three preprinted UPS labels purchased through UPS shipper account C4816C. All three labels had a return address of "Piccone Apparel, Robin Piccone, 6444 Fleet St, Commerce, California" with a telephone number of "310-559-6702" and legitimate destination addresses along HERNANDEZ's UPS delivery route.

10. Based on my training and experience, I know that drug traffickers will use several different techniques to send or receive drug proceeds and payments from customers for narcotics. One technique commonly used by drug traffickers is shipping cash utilizing the United States Postal Service or commercial shipping companies, such as UPS and FedEx. Law enforcement

believes the shipping labels found within the cocaine parcels
were provided by the MAJEAU DTO to facilitate the receipt of
payments for drugs sent to customers across the United States.
The use of prepaid, pre-addressed shipping labels allows
customers to send payments to the MAJEAU DTO in a way that
avoids any errors in shipment.  All UPS parcels containing
cocaine which have been seized by law enforcement investigators
since the initiation of this investigation have contained
prepaid, pre-addressed return shipping labels.

     2.   <u>December 13, 2023 – Seizure of Two UPS Parcels in
St. Louis, Missouri</u>

    11.  On December 13, 2023, DEA St. Louis investigators
seized two UPS parcels, purchased through UPS shipper account
C4816C, with a destination addresses in the Eastern District of
Missouri and a shipper address of "Piccone Apparel, Robin
Piccone, 6444 Fleet St, Commerce, CA."  The shipper address was
found to be a legitimate address along HERNANDEZ's UPS delivery
route.  A search of the parcels revealed a total of twelve (12)
kilograms of suspected cocaine, which field tested positive for
cocaine utilizing a TruNarc device.  The parcels were packaged
identically and contained preprinted UPS labels, purchased
through UPS shipper account C4816C, with a legitimate
destination address along HERNANDEZ's UPS delivery route.

     3.   <u>December 2023 - Seizure of Two UPS Parcel in Ohio
and Maryland</u>

    12.  On December 13, 2023, Cuyahoga County Sheriff's
Department seized a UPS parcel containing six kilograms of
suspected cocaine. The purchased through the UPS shipper account

C4816C, destined for Twinsburg, Ohio. The following day Maryland State Police seized a UPS parcel, with a destination address in Germantown, Maryland. The parcel was again purchased through the same UPS shipper account and containing six kilograms of suspected cocaine. Both parcels were packaged identical to the parcel discussed in the above section and contained preprinted UPS labels, purchased through the same UPS shipper account, with destination addresses along HERNANDEZ's UPS delivery route.

      4.   <u>December 2023 - Seizure of Two UPS Parcel in St. Louis, Missouri and Controlled Delivery of Suspect Parcel 1</u>

13. On December 16, 2023, DEA St. Louis agents seized a UPS parcel ("Suspect Parcel 1"), again purchased through the UPS shipper account C4816C, with a destination address in the Eastern District of Missouri. Suspect Parcel 1 contained a clear plastic bin with six clear heat-sealed plastic bags containing a crystal-like substance weighing approximately 4,950 grams of suspected methamphetamine. The suspected methamphetamine field tested positive for methamphetamine utilizing a TruNarc device.

14. On December 18, 2023, investigators conducted a controlled delivery of Suspect Parcel 1 at the destination address. At approximately 5:10 p.m., a black male wearing a blue jacket (hereinafter "INDIVIDUAL 1"), picked up Suspect Parcel 1 from the mailroom of the apartment complex. INDIVIDUAL 1 walked the package to the parking garage where he placed the package in the rear seat of a red Range Rover. INDIVIDUAL 1 then left the apartment complex. Roving surveillance followed INDIVIDUAL 1 as he traveled Highway 64 East to Jefferson Avenue.

Eventually, INDIVIDUAL 1 was detained and Suspect Parcel 1 was seized from his vehicle.  It was later determined that INDIVIDUAL 1 resided at 1917 Rutger Street, Apt. 205, St. Louis, Missouri.  A second parcel seized on December 19, 2024, detailed in the subsequent section, had a destination address of 1917 Rutger Street, St. Louis, Missouri, with no specified apartment number.  After his arrest, INDIVIDUAL 1 advised investigators that he had picked up Suspect Parcel 1 for his friend "J-Rock," FNU LNU, whom he had been on a FaceTime video call with during his procurement of Suspect Parcel 1.  INDIVIDUAL 1 consented to the search of his cellular telephone and provided investigators with the passcode to access his cellular telephone.  INDIVIDUAL 1 did not cooperate any further with the investigation and advised he had no knowledge of any additional incoming drug parcels.

15.  On December 19, 2023, DEA St. Louis agents seized a second UPS parcel, purchased through the same UPS shipper account as the above parcel, with a destination address of "Timothy Smith, 1917 Rutger St, Saint Louis, MO 63104." The parcel was packaged identical to Suspect Parcel 1 and again contained six clear heat-sealed plastic bags containing a crystal-like substance weighing approximately 4,950 grams of suspected methamphetamine, which again field tested positive for methamphetamine utilizing a TruNarc device.

16.  Pursuant to a subpoena, UPS provided the following information for UPS shipper account #C4816C: account start date of June 5, 2023; account name of Piccone Apparel; account

address of 6444 Fleet Street, Commerce, California; account
contact name of Tony Andreu; account phone number of 310-559-
6702; and account email address of alexxis.r@robinpiccone.com.
Additionally, UPS provided the following information for UPS
shipper account #5W07W5: account start date of September 21,
2018; account name of Event Décor Direct – CA; account address
of E. 6541 Washington Blvd, Bay 9, Commerce, California; account
contact name of Andrew Walker; account phone number of 562-348-
230; and account email address of trafficbrick@gmail.com.

**B.    Identification of Jonathan Ward Through a Consent
Search of Individual's Cellular Telephone**

17.    Pursuant to a consent search of INDIVIDUAL 1's
cellular telephone, investigators discovered that on December
18, 2023 -- the date of Suspect Parcel 1's controlled delivery
-- INDIVIDUAL 1 had been in contact through Facetime and
traditional voice calls with telephone number 323-532-5859 on 16
occasions starting at 2:44 p.m.  On that same day, at 5:04 p.m.,
INDIVIDUAL 1 had an outgoing Facetime call to 323-532-5859 which
lasted approximately nine minutes.  INDIVIDUAL 1 then received
an incoming voice call from 323-532-5859 that lasted
approximately three minutes.  At approximately 5:20 p.m.,
INDIVIDUAL 1 sent two photographs of the top and bottom of
Suspect Parcel 1 to 323-532-5859.  At approximately 5:54 p.m.,
323-532-5859 sent a text message to INDIVIDUAL 1 stating "Hit me
when you get to the house," followed by a text message at 7:22
p.m., which stated, "Why you send me to voicemail."

18.    A text message conversation between telephone number 323-532-5859 and INDIVIDUAL 1 occurred between November 10, 2023, and December 18, 2023.  The text message conversation was initiated by 323-532-5859 on November 10, 2023, at 1:03 p.m., with the text message, "This lil bee my new number."  Through a search of INDIVIDUAL 1's telephone contacts, it was discovered that there were three contacts related to the name "Lil B."  The user of 323-532-5859 was believed to be WARD, further explained below:

a.    On November 12, 2023, INDIVIDUAL 1 sent a text message to WARD asking for WARD to provide INDIVIDUAL 1 with WARD's CashApp username.  WARD responded with the CashApp Cashtag "$my3kids54."  Investigators received records pursuant to a CashApp (Block Inc.) subpoena pertaining to the CashApp account associated with $my3kids54.  The $my3kids54 CashApp account was verified under the name Jonathan WARD.  Further analysis revealed that from January 20, 2023, to August 11, 2023, WARD sent money through CashApp to INDIVIDUAL 1 on five occasions totaling $307 United States currency.  From December 21, 2022, to November 13, 2023, INDIVIDUAL 1 sent money through CashApp to WARD on eleven occasions totaling $1,195 United States currency.

b.    On November 21, 2023, WARD sent a photograph of three black males, one of which was INDIVIDUAL 1.  The second individual was positively identified as WARD through his California driver's license photo.  I subsequently learned that WARD is a convicted felon.

19.    Based on my training and experience, when drug traffickers amass proceeds from the sale of controlled substances, they often attempt to conceal those proceeds and their origins from discovery by law enforcement using different techniques, including by using peer-to-peer currency exchanges and/or platforms.  Drug traffickers will also utilize peer-to-peer currency exchanges to receive payments or send payments for drugs and pay individuals working on behalf of the DTO.

**C.    Identification of IP Address 172.113.105.225, 108.94.91.37 and 104.173.175.172 Tracking Suspected Drug and Cash Parcels**

20.    Investigators received records pursuant to a subpoena pertaining to the Internet Protocol ("IP") [1] addresses which had tracked UPS parcels shipped using the UPS shipper accounts C4816C, 649516 and 5W07W5.  A large number of IP addresses were determined to be virtual private networks ("VPNs") or hosting sites.[2]

---

[1] An internet protocol address ("IP address") is a string of numbers assigned to an internet-connected device, much like an address for a residence. A computer network uses the IP address to communicate with other computers, websites and all parts of cyberspace. Essentially, IP addresses are how computers on the internet recognize one another. An internet service provider (ISP) assigns IP addresses to your internet connected devices and every IP address is unique. Considering every internet connected device has an IP address, billions of IP addresses exist.

[2] VPNs provide online privacy and anonymity by creating a private network from a public internet connection.  VPNs mask an internet protocol ("IP") address so online actions are virtually untraceable. Most importantly, VPN services establish secure and encrypted connections to provide greater privacy than even a secure Wi-Fi hotspot.  VPNs are commonly used by drug traffickers to mask their location and identity to add additional anonymity to their online presence.

21.   Investigators were further able to identify three traceable IP addresses within the data.  Those IP addresses were identified as 172.113.105.225, associated with WARD; 104.173.175.1723 associated with HERNANDEZ; and 108.94.91.374 associated with MAJEAU, as further explained in subsequent paragraphs.

22.   The UPS shipper accounts C4816C and 5W07W5 were identified through the previously discussed seized drug parcels. The UPS shipper account 649516 was identified through an analysis of IP tracking information as a common account tracked by the IP addresses associated with WARD, HERNANDEZ and MAJEAU. It was further discovered that the UPS shipper account 649516 had an account name of Piccone Apparel, account address of 6444 Fleet Street, Commerce, California, and account phone number of 310-559-6702, which were the same account identifiers as the UPS shipper account C4816C, which is a legitimate business and address along HERNANDEZ's UPS delivery route.

23.   Investigators received records pursuant to subpoena pertaining to the UPS tracking numbers tracked by the IP addresses associated with WARD, HERNANDEZ and MAJEAU.  21 parcels were identified, all having the same postage

[3] According to records received by Charter Communications pursuant to a subpoena, the IP address 104.173.175.172 was subscribed to Antonio Hernandez, with a service address of subject premises 4, with IP usage dates from January 19, 2022 to January 26, 2024.

[4] According to records received by AT&T pursuant to a subpoena, the IP address 108.94.91.37 was subscribed to MAJEAU, with a service address of SUBJECT PREMISES 1, a contact phone number of 949-750-5453 and a contact email address of majeaujimmy1@icloud.com.

characteristics of the seized parcels and return preprinted
shipping labels described in Section IV(A) of this affidavit, to
include return address, UPS shipper account used to purchase the
postage (shipper #C4816C), shipped from/origination location for
outgoing suspected drug parcels of Compton, California, company
name of Piccone Apparel, shipper phone number of 310-559-6702
and prepaid postage weights between 10 to 15 pounds.  The
shipper account address is a legitimate address associated with
the legitimate business, Piccone Apparel, along HERNANDEZ's UPS
delivery route. The IP address associated with WARD tracked five
parcels with a destination address of "Jordan Smith, 9015 Eager
Rd Apt 350, Brentwood, MO 63144," the same destination address
as Suspect Parcel 1, from September 2023 to October 2023. The IP
address associated with HERNANDEZ tracked six parcels destined
for addresses located in Florida, Virginia, Michigan, and North
Carolina in September 2023. The IP address associated with
MAJEAU tracked ten UPS parcels destined for addresses in Georgia
and Michigan as well as Commerce, California and Saint Louis,
Missouri in September 2023.

24.  Additionally, all three IP addresses had tracked an
additional ten UPS tracking numbers associated with the UPS
shipper account #649516.  These additional parcels had a shipped
from/origination location for outgoing suspected drug parcels of
Compton, California, destination address in Commerce,
California, company name of Piccone Apparel, shipper phone
number of 310-559-6702, and prepaid postage weights of 10 and 15
pounds, similar to the seized UPS parcels and return preprinted

shipping labels described in Section IV(A).  The shipper account
address is a legitimate address associated with the legitimate
business, Piccone Apparel, along HERNANDEZ's UPS delivery route.
The parcels tracked by the IP address associated with WARD had
package weights of 9 and 18 pounds. The IP address associated
with WARD tracked three UPS parcels with the destination address
of "1917 Rutger St, St. Louis, MO 63104," previously identified
as INDIVIDUAL 1's address in August 2023.  The IP address
associated with HERNANDEZ tracked four UPS parcels destined for
addresses in Michigan, Virginia, Maryland and Chesterfield,
Missouri from March 2023 to August 2023.  The IP address
associated with MAJEAU tracked three UPS parcels destined for
addresses in Los Angeles/Commerce, California in August 2023.

25.  Investigators also discovered that two of the three IP
addresses had tracked an additional nine UPS tracking numbers
associated with the UPS shipper account #5W07W5.  The parcels
had a shipped from/origination location for outgoing suspected
drug parcels of Compton, California, destination address in
Commerce, California along HERNANDEZ's delivery route for
suspected cash parcels, a return address company name of Event
Décor Direct-CA, "Csgn Phone Number" of 13235555555, and prepaid
postage weight of 15 pounds similar to the seized UPS parcels
described in Section IV(A)(1).  In addition, they all had the
same return address information.  The shipper account address is
a legitimate address along HERNANDEZ's UPS delivery route.  The
IP address associated with HERNANDEZ tracked two UPS parcels
destined for addresses in Michigan and Virginia from February

2023 to August 2023.  The IP address associated with MAJEAU tracked seven UPS parcels destined for addresses in Ohio, Virginia, Michigan, New York and Commerce, California from August 2023 to November 2023.

26.  Additional UPS parcels were found that had been shipped from UPS stores in the Hawthorne, California not utilizing a UPS business or shipper account. The following UPS tracking numbers were tracked by 172.113.105.225:

    a.    1Z02083R0396172014 - Destination Address of: Aaron Russell, 1917 Rutger St, St. Louis, MO 63104.  Delivery date: March 21, 2023

    b.    1Z8A79R90388088173 - Destination Address of: Aaron Brown, 1917 Rutger St, St. Louis, MO 63104.  Delivery date: March 20, 2023

    c.    1Z02083R0369273662 - Destination Address of: Brittany, 9015 Eager Rd Apt 350, Brentwood, MO 63144.  Delivery date: August 22, 2023

27.  Drug traffickers often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and money throughout the United States.  They do so, at least in part, because of the convenience of the service, the availability of internet and phone tracking services, the speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another.  They often use hand-written air bills, drop the packages near closing time, pay for such services in cash or

cryptocurrencies, and use fictitious names, addresses, and
telephone numbers to avoid detection by law enforcement.

      1.   <u>Investigators Associate the IP Address
         104.173.175.172 with HERNANDEZ and SUBJECT
         PREMISES 4</u>

    28.  Investigators received records pursuant to a subpoena
in response to HERNANDEZ's employment and route history, as well
as delivery scan locations pertaining to suspected drug parcels.
From the information provided by UPS, it was determined that
HERNANDEZ was employed by UPS as a delivery driver.  It was
determined that the locations where all suspected and seized
cash parcels had been delivered/shipped and addressed to were
within HERNANDEZ's UPS delivery route.  Furthermore,
investigators learned, specifically as it related to historical
delivery scans of suspected money parcels, that there were
discrepancies in the intended delivery location compared to the
actual location to which the suspected money parcel was scanned
as delivered. The delivery locations and scan locations did not
match and were several blocks away from each other.  According
to UPS security representatives, this is an uncommon practice by
delivery drivers and will send up "red flags" to supervisors,
which could potentially become a disciplinary issue.
Investigators believe HERNANDEZ is scanning suspected cash
parcels at suspected meeting locations.  Agents believe
HERNANDEZ then transferred these suspected cash parcels to other
members of the DTO.

    29.  After the parcels containing illicit drugs were seized
in December 2023 discussed above, investigators attempted to

seize several suspected cash parcels, however, were unsuccessful. Through UPS data systems, it was discovered that after the December 2023 parcel seizures, HERNANDEZ had started marking some of the suspected cash parcels as "undeliverable," but the parcels were never scanned back into the UPS system. According to UPS security representatives, when parcels are marked undeliverable by a delivery driver, UPS will attempt to contact the shipper and/or recipient to procure a more accurate or alternate delivery address.  The undeliverable parcels should then be returned to the UPS hub and scanned back into the building, but this did not occur as it pertained to HERNANDEZ and the suspected money parcels.  Investigators believe HERNANDEZ is receiving the suspected cash parcels on behalf of the DTO due to his access to UPS parcels through his employment and has entered false delivery scans into the UPS system to thwart law enforcement's investigative efforts. Additionally, the drug parcels seized had an origination scan from the Compton, California UPS Center.  UPS advised that HERNANDEZ works out of the Compton UPS Center and all packages he picks up along his route will have an origination scan from the Compton Center.  UPS provided the phone number 323-895-8930 as the phone number on file in HERNANDEZ's employment record.

30.  According to records received from Charter Communications pursuant to a subpoena, the IP address 104.173.175.172 was subscribed to Antonio Hernandez, with a service address of SUBJECT PREMISES 4, with IP usage dates from January 19, 2022, to January 26, 2024.  Additionally, according

to records received by T-Mobile, 323-895-8930 was subscribed to
Antonio Hernandez with a service address of SUBJECT PREMISES 4,
with an activation date of February 16, 2023.  According to UPS
shipment records, SUBJECT PREMISES 4 had received numerous
parcels addressed to HERNANDEZ from February 2023 to January
2024.  Investigators have observed HERNANDEZ at the above
address on several occasions during surveillance operations as
recently as September 2024.

31.  Investigators received records pursuant to a subpoena
from Block, Inc. pertaining to the CashApp account associated
with 323-895-8930.  The CashApp account associated with 323-895-
8930 was verified under the name Eric HERNANDEZ, with a date of
birth of June 3, 1983, and social security number ending in
-6456.  SUBJECT PREMISES 4 was the only address associated with
the CashApp account.  Access records show that from February 6,
2023, to July 23, 2023, the IP address 104.173.175.172 accessed
and conducted transactions under HERNANDEZ's CashApp account.

2.   Investigators Associate the IP Address
108.94.91.37 with MAJEAU and SUBJECT PREMISES 1

32.  According to records received from AT&T pursuant to a
subpoena, the IP address 108.94.91.37 was subscribed to MAJEAU,
with a service address of SUBJECT PREMISES 1, a contact phone
number of 949-750-5453, and a contact email address of
majeaujimmy1@icloud.com.  Additionally, according to records
received by T-Mobile, 949-750-5453 was subscribed to "High
Desert Sweeping," with a billing address of SUBJECT PREMISES 2,
with an activation date of June 14, 2018.  Based on my training

and experience, I know that it is common practice for drug traffickers to utilize telephone numbers subscribed to fictitious names and/or businesses to hide the true identity of the user of the telephone from law enforcement.

33. Investigators received records from Block, Inc. pursuant to a subpoena pertaining to the CashApp account associated with 949-750-5453. The CashApp account associated with 949-750-5453 was verified under the name Jimmy MAJEAU, with a date of birth of January 9, 1982, and social security number ending in -4977. The number 949-750-5453 was the current and only telephone number associated with the account. SUBJECT PREMISES 2 was also the only address associated with the CashApp account.

34. Access records show that from August 16, 2023, to February 4, 2024, the IP address 108.94.91.37 was captured accessing and conducting transactions under MAJEAU's CashApp account. Further analysis reveals that from January 7, 2023, to February 9, 2024, MAJEAU sent approximately $68,521.50 to other CashApp users, but only received a total of approximately $5,450.

      3.   <u>Investigators Associate the IP Address 172.113.105.225 with WARD</u>

35. Investigators received records pursuant to a CashApp (Block Inc.) subpoena pertaining to the CashApp account associated with $my3kids54, belonging to WARD, as discussed in Section IV(B). From January 27, 2023, to January 10, 2024, the IP address 172.113.105.225 was captured accessing and conducting

transactions for WARD's CashApp account. According to records received by Charter Communications pursuant to a subpoena, the IP address 172.113.105.225 was subscribed to Deborah Fuentes, with a service address of 11803 Wilkie Ave, Hawthorne, CA with IP usage dates ("lease log") of January 7, 2023, to January 26, 2024.

### D.    Seizure of Cash Parcels Destined for Commerce, California

36.    On February 22, 2024, DEA St. Louis agents interdicted a UPS parcel which had originated from Detroit, Michigan, with a legitimate destination address along HERNANDEZ's UPS delivery route. The UPS label had the same characteristics[5] of the preprinted labels believed to be utilized to send drug proceeds back to the DTO at addresses along HERNANDEZ's UPS delivery route, located in the parcels discussed in Section IV(A). Pursuant to a federal search warrant issued by the United States District Court for the Northern District of Illinois (Case Nos. 24 M 118), agents located bundles of United States currency totaling $19,350 in the parcel. The currency had been heat sealed in plastic, wrapped in clear green plastic wrap, and spray foamed into a secondary box within the parcel.

---

[5] The following characteristics are consistent with suspected cash parcels identified by investigators: a prepaid UPS label purchased through one of the three identified UPS shipper accounts (C4816C, 5W07W5 and 649516); prepaid postage weights of 10, 12 and 15 pounds; time between the postage purchase date and the origination scan exceeding ten days; return address of EDD Shipping or Piccone Apparel with a shipper zip code of 90040, 90067 or 90026; a delivery address on HERNANDEZ's UPS delivery route; and the UPS origination scan is outside California.

37.   Additionally, on March 12, 2024, DEA agents in Los Angeles seized a UPS parcel which had originated from Landover, Maryland, with a destination address along HERNANDEZ's UPS delivery route.  The UPS parcel again had the same characteristics of the preprinted labels, described in footnote 5, believed to be utilized to send drug proceeds back to the DTO. Pursuant to a California state search warrant, agents located within the parcel bundles of United States currency totaling $50,000. The bundles were wrapped in clear plastic wrap and spray foamed into a secondary box within the parcel.

**E.   Precision Location Information Search Warrants**

38.   During the course of the investigation, law enforcement obtained the following cell phone location data warrants:

a.   On February 27, 2024, the Hon. Rodney H. Holmes, United States Magistrate Judge, Eastern District of Missouri, issued a phone location warrant which authorized the interception of location data for 949-750-5453 ("Subject Cellular Telephone 1") used by MAJEAU (Case No. 4:42 MJ 9068 RHH) and 323-895-8930 ("Subject Cellular Telephone 2") used by HERNANDEZ.  (Case No. 4:42 MJ 9067 RHH.)

b.   On April 9, 2024, the Hon. John M. Bodenhausen, United States Magistrate Judge, Eastern District of Missouri, issued an extension for a phone location warrant which authorized the interception of location data for Subject Cellular Telephones 1 and 2.  (Case No. 4:42 MJ 9067 RHH.)

c.    On May 30, 2024, the Hon. John M. Bodenhausen,
United States Magistrate Judge, Eastern District of Missouri,
issued an extension for a phone location warrant which
authorized the interception of location data for Subject
Cellular Telephones 1 and 2.  (Case No. 4:42 MJ 1189 JMB.)  The
court also issued an initial phone location data warrant for
(712) 685-3009 ("Subject Cellular Telephone 3," associated with
MAJEAU's Lamborghini SUV.  (Case No. 4:24 MJ 1191 JMB.)

d.    On July 17, 2024, the Hon. John M. Bodenhausen,
United States Magistrate Judge, Eastern District of Missouri,
issued an extension for a phone location warrant which
authorized the interception of location data for Subject
Cellular Telephones 1, 2 and 3.  (Case Nos. 4:42 MJ 1230 JMB,
4:42 MJ 1231 JMB, and 4:24 MJ 1229 JMB.)

e.    On August 27, 2024, the Hon. Shirley P. Mensah,
United States Magistrate Judge, Eastern District of Missouri,
issued an extension for a phone location warrant which
authorized the interception of location data for Subject
Cellular Telephones 1, 2 and 3.  (Case Nos. 4:42 MJ 1230 JMB,
4:42 MJ 1231 JMB, and 4:24 MJ 1229 JMB.)

39.    On May 14, 2024, UPS employees advised DEA agents that
a UPS parcel, tracking number 1Z5AR3140317420035, was on
HERNANDEZ's UPS delivery vehicle and out for delivery.  The
postage had been purchased from a Staples shipping center and
shipped from the Dearborn, Michigan area, suburb of Detroit,
Michigan, with a delivery address of "Offstage Storage, 2301 S
Tubeway, Commerce, CA."  Investigators have identified several

addresses in the Detroit, Michigan, area which are believed to
have received drug parcels from the MAJEAU DTO.  DEA agents, in
response, initiated surveillance in the area of HERNANDEZ's UPS
delivery route near East Washington Boulevard and Saybrook
Avenue in Commerce, California.

40.  Agents checked the status of the parcel using the
public UPS website.  They observed that at 3:30 p.m., the status
of the parcel had changed to "we tried to deliver to the
business, but it was closed.  A second attempt will be made the
next business day."  The parcel had been addressed to Offstage
Storage.  Through open-source research, agents discovered
Offstage Storage was located at 2301 S Tubeway in Commerce,
California, had business hours from 9 a.m. to 5 p.m., and was
open at the time of the UPS "undeliverable" scan.

41.  At approximately 4:28 p.m., the location data and
radius of Subject Cellular Telephone 1 (belonging to MAJEAU) was
near Commerce, California, headed in the direction of
HERNANDEZ's location.  At approximately 4:38 p.m., the location
data and radius for Subject Cellular Telephone 1 (belonging to
MAJEAU) began overlapping with that of Subject Cellular
Telephone 2 (belonging to HERNANDEZ).

42.  At approximately 4:35 p.m., agents observed an unknown
male (the "UM") standing outside the passenger side of
HERNADEZ's UPS delivery vehicle. The UM and HERNANDEZ were
conversing through the open passenger side of the UPS delivery
vehicle.  After several minutes, the UM walked away from the UPS
delivery vehicle holding a medium sized cardboard box with both

hands in front of him.  The UM then walked to the passenger side
of a white Lamborghini SUV, bearing California registration
8XRF034[6], that was parked approximately 30-40 feet in front of
the UPS delivery vehicle.  Several seconds later, the UM walked
in front of the UPS delivery vehicle to the driver's side of the
white Lamborghini SUV and entered the vehicle.  The UM remained
seated in the vehicle for approximately five minutes, then drove
away from the area.  The UM was described as either a light-
skinned black or Hispanic male, approximately 25-35 years of
age, approximately 6 feet tall, and approximately 180-200
pounds, with similar characteristics as MAJEAU, leading agents
to believe the UM who had met with HERNANDEZ was MAJEAU.  The UM
was wearing a black baseball cap, black t-shirt, and light-
colored blue jeans.  At approximately 4:58 p.m., the location
data and radius of Subject Cellular Telephone 1 (belonging to
MAJEAU) were no longer in the area.  Investigators were unable
to maintain surveillance of the white Lamborghini.

    43.  At approximately 7:07 p.m., agents observed an
Instagram status that had been posted to MAJEAU's Instagram
account, "majesty_jm," an hour prior.  The status was a photo of
the steering wheel console of a Lamborghini with an individual
seated in the driver's seat.  The photo was from the waist down
and showed the legs of an individual who was wearing light-

---

[6] Through DMV checks of the CA 8XRF034, it was discovered
that it was registered to a 2021 Lamborghini utility vehicle,
vehicle identification number ZPBUA1ZL9MLA13604, with a
registered owner of Midway HFCA LLC LSR, Flash of Class LLC or
Robin Morris LSE, at 510 Centinela Avenue Apt 110, Inglewood,
California.

colored blue jeans, further confirming investigators' suspicions that MAJEAU was the UM meeting with HERNANDEZ.

44.  Utilizing an undercover Instagram account, investigators determined "majesty_jm" was a public Instagram account, accessible to all Instagram users.  Investigators believe the "jm" stands for Jimmy MAJEAU.

45.  On July 12, 2024, investigators observed a photograph of MAJEAU and an unidentified male was posted to the account on November 11, 2016.  One of the more recent photographs was posted on May 21, 2024, and depicted MAJEAU wearing a black t-shirt with the OG Nation emblem and a caption, "EMPLOYEE OF THE MONTH JAN-DEC."

46.  The Instagram account had 33 posts (30 of the 33 posts depicted MAJEAU), approximately 13,000 followers, following 313 Instagram accounts, with a screenname of "J Majesty" and a bio of "LO$ ANG€L€$ BORN $GV RAI$€D" with the linked Instagram accounts of "apeish_og," "ognationmaywood" and "ognationelmonte."  Investigators have monitored posts to the "majesty_jm" Instagram account's "story."  Investigators have observed, almost daily, photos and videos of MAJEAU, members of his family and vehicles known to be regularly driven by MAJEAU posted to the daily Instagram story of "majesty_jm." Investigators have positively identified the photos posted to the "majesty_jm" as MAJEAU from surveillance operations and his California driver's license photo.  Investigators strongly believe "majesty_jm" is controlled by and is the primary Instagram account of MAJEAU.

47.  On May 15, 2024, UPS employees advised agents that the target parcel was never scanned back into the UPS Compton Center.  They advised that this is not common and that the parcel should have been scanned back into the UPS system if it was returned to the Compton Center for a second attempted delivery the following day.  Based on the information provided by UPS regarding the target parcel, previous money seizures and the observations made by agents, investigators believe MAJEAU met with HERNANDEZ in order to receive drug proceeds.

F.    **Authorization for the Interception of Oral Communication and Visual, Non-Verbal Conduct Within and Around HERNANDEZ's Assigned UPS Delivery Vehicle**

48.  On August 1, 2024, the Hon. Matthew T. Schelp, United States District Judge for the Eastern District of Missouri, issued an order authorizing the initial interception of oral communications within and around HERNANDEZ's UPS delivery vehicle (Case Nos. 4:24MC866 MTS).  The following day, United States Magistrate Judge Michael R. Wilner, Central District of California, issued an order authorizing the initial interception of visual, non-verbal conduct within and around HERNANDEZ's UPS delivery vehicle (Case Nos. 2:24-mj-04629).

49.  On August 4, 2024, FBI investigators installed four cameras and three audio listening devices in HERNANDEZ's UPS delivery vehicle.

50.  On August 9, 2024, DEA investigators conducted surveillance in the area of HERNANDEZ's UPS delivery route.  At the time, HERNANDEZ was not driving the UPS delivery vehicle FBI agents had installed cameras and listening devices in, due to it

being out for maintenance.  He was instead driving a loaner UPS delivery vehicle.  UPS employees had advised DEA agents that a UPS parcel, matching the suspected cash parcel profile, was on HERNANDEZ's loaner UPS delivery vehicle and out for delivery that day.

51.  At approximately 4:58 p.m., investigators observed a grey Honda Accord, bearing California registration 7ZYF529[7], park just in front of HERNANDEZ's UPS delivery vehicle.  Once the vehicle parked, HERNANDEZ exited the UPS delivery vehicle and walked toward the Honda as an unidentified female, later positively identified as Andrea ALVAREZ through her California driver's license photo, exited the front driver's side door. The two began conversing as ALVAREZ opened the trunk of the Honda.  ALVAREZ proceeded to hand a total of five brown boxes, approximately 12"x12"x12", to HERNANDEZ, one at a time. HERNANDEZ then brought each box individually to his UPS delivery vehicle and placed them inside.  After all five boxes had been passed to HERNANDEZ, ALVAREZ walked to the rear of the UPS delivery vehicle and retrieved one brown box, believed to be the aforementioned suspected cash parcel from HERNANDEZ.  ALVAREZ walked back to the Honda and secured the suspected cash parcel in the trunk of the vehicle.  ALVAREZ soon after left the area in the Honda.

---

[7] Through DMV checks, it was discovered that the registration belonged to a 2005 four door Honda, vehicle identification number 1HGCM56455A189420, with a registered owner of Roberto Mena Jr, at 3620 Patio Place, Los Angeles, California.

52.   On August 10, 2024, UPS analytics employees advised
DEA agents that 40 boxes from previously identified UPS shipper
accounts 5W07W5 and 649516, had been scanned into the Compton
UPS Center on August 9, 2024.  Of those 40 parcels, five parcels
were identified as having a prepaid postage weight of 15 pounds,
consistent with previously seized drug parcels, with destination
addresses in New Jersey, Connecticut, Ohio, and Missouri.  The
postage for these five parcels had been purchased through the
UPS shipper account 649516.  UPS analytics personnel placed a
flag/alert on the parcels for attempted interception to
determine if the parcels indeed contained illicit drugs.

53.   On August 15, 2024, pursuant to the UPS suspected
narcotics flag for the above five parcels, UPS security
personnel had secured and opened UPS parcel tracking number
1Z649516P277466626, in accordance with UPS policy.  The parcel
had a destination address of "James Paul, 928 Highland Avenue,
Torrington, Connecticut, 06790," and a shipper address of
"Piccone Apparel, 6444 Fleet St, Commerce, CA, 90040."  Located
inside the parcel were five individually wrapped "bricks" of
suspected cocaine, approximately one kilogram each, spray foamed
into a mass and wrapped in black X-Ray paper.  The kilograms had
the marking of a hexagon with mirrored "P" in the middle,
wrapped in clear green plastic wrap, with a total weight of
approximately 5.7 kilograms.  The parcel also contained a
preprinted UPS label, tracking number 1Z6495169077520309, with a
destination address of "Warehouse, Piccone Apparel, 6444 Fleet
Street, Commerce, California," and a return address of "EBW

10250 Santa Monica Boulevard, Los Angeles, California 90067."
The parcel and its contents were turned over to DEA Hartford
Connecticut investigators.  Investigators attempted to conduct a
controlled delivery of the parcel.  Unfortunately, the parcel
was never retrieved by any individuals.  Investigators attempted
to conduct a knock and talk of the residence, but gained no
cooperation from the occupants.

54.  Additionally, on August 15, 2024, St. Louis DEA
investigators conducted surveillance of 7117 Alabama Avenue, St.
Louis, Missouri, the intended delivery address for one of the
five previously identified parcels, UPS tracking number
1Z649516P278762018.  The parcel had a destination address of
"Franklin Byers, 7117 Alabama Avenue, St. Louis, MO 63111," and
a shipper address of "Piccone Apparel, 6444 Fleet St, Commerce,
CA, 90040."  Investigators arrived at the location approximately
30-40 minutes after the parcel had been delivered and were
unable to locate the parcel in front of the residence.
Investigators checked the status of the parcel on the public UPS
website.  The tracking number showed that the parcel had been
delivered at 12:41 p.m. and provided a photograph showing the
parcel at the front door of the residence.  The parcel was a
plain brown box, secured with clear tape, with a UPS label
affixed to the top.

55.  At approximately 1:50 p.m., investigators observed a
blue Jeep Gladiator, bearing Kansas registration RO22907, arrive
and park on the street directly in front of 7117 Alabama Avenue.
Investigators observed the sole occupant, a white female driver,

INDIVIDUAL 2, speaking on what they believe to be a cellular telephone.  INDIVIDUAL 2 parked briefly in front of the residence before pulling down the street, continuing to speak on the cellular telephone.  Investigators observed INDIVIDUAL 2 circle the block and pull down the back alley between Alabama and Idaho Avenue and park directly in the rear of 7117 Alabama Avenue.  Just after stopping behind the residence, investigators observed a black male, INDIVIDUAL 3, wearing an orange shirt, exit the rear of 7117 Alabama Avenue.  Investigators observed INDIVIDUAL 3 carrying a large brown bag in his hand as he approached the front passenger door of the vehicle.  INDIVIDUAL 3 opened the front passenger door of the vehicle and placed the bag inside.  After what appeared to be a brief conversation, INDIVIDUAL 3 closed the passenger door and INDIVIDUAL 2 pulled down the alley away from the residence.

56.  Investigators maintained surveillance of INDIVIDUAL 2 and the vehicle until it was ultimately stopped by a Maryland Heights, Missouri marked police vehicle.  A subsequent search of the vehicle revealed a brown pillowcase containing a brown box sealed with clear tape and "Alabama" written in black sharpie on the top.  There looked to be a partial label that had been mostly torn off the box with no identifying information. Located inside the parcel were five individually wrapped "bricks," kilograms of suspected cocaine, spray foamed into a mass and wrapped in black X-Ray paper.  The kilograms had the marking of a hexagon with mirrored "P" in the middle, wrapped in clear green plastic wrap, with a total weight of approximately 5.7

kilograms.  The parcel was packaged identically to that of the above-mentioned parcel seized in Connecticut.  Additionally, the "bricks" of suspected cocaine had the identical markings as the suspected cocaine seized from the above-mentioned parcel, leading agents to believe both parcels had been shipped by and from the same organization.  The "bricks" field tested positive for cocaine.

57.  On August 16, 2024, investigators were monitoring the location data of Subject Cellular Telephone 1 (belonging to MAJEAU).  At approximately 11:49 a.m., location data for Subject Cellular Telephone 1 showed it was in the area of SUBJECT PREMISES 2. At approximately 11:56 a.m., Subject Cellular Telephone 1 began moving toward the area of HERNANDEZ's UPS delivery route.  UPS employees had advised DEA agents that a UPS parcel, matching the suspected cash parcel profile was on HERNANDEZ's UPS delivery vehicle and out for delivery that day.

58.  At approximately 12:28 p.m., HERNANDEZ arrived in the area of Saybrook Avenue, Commerce, California and parked on the shoulder of the road.  Investigators observed HERNANDEZ, after manipulating his cellphone,[8] enter the rear cargo hold of his UPS delivery vehicle and retrieve two boxes.  He then placed the boxes in the front cab area before returning to the driver's seat of the UPS delivery vehicle and returned to manipulating his cellphone.  At approximately 12:29 p.m., a white

---

[8] Through toll analysis, it was discovered that the known phone numbers of MAJEAU and HERNANDEZ were never in communication on August 16, 2024, leading agents to believe MAJEAU and HERNANDEZ were communicating through encrypted messaging applications.

Lamborghini, bearing California registration 8XRF034, known to be driven by MAJEAU, pulled up past the UPS delivery vehicle. The Lamborghini then backed in, parking directly in front of the UPS delivery vehicle. At approximately 12:36 p.m., investigators observed MAJEAU exit the front driver's side door of the Lamborghini wearing jeans, a white t-shirt and a flat brim baseball hat.  He then proceeded to open the rear hatch of the Lamborghini and walk to the passenger side of the UPS delivery vehicle.  The following is an excerpt of a conversation which had been intercepted between MAJEAU and HERNANDEZ, while HERNANDEZ was seated in the UPS delivery vehicle and MAJEAU was standing just outside the front passenger doorway of the UPS delivery vehicle:

HERNANDEZ:    Hey what's up man?

MAJEAU:    (*MAJEAU walks up to the passenger side of the UPS delivery vehicle, standing just outside the passenger door*) Hey…yesterday that one that went to uh Connecticut, for Torrington, CT. It got there and then my friend tried to tell me "hey they sent that…they sent that the DEA came and picked it up" and I'm just like ok so who got arrested. Well nobody they just came and knocked on the door like 8, 9 deep, said DEA and they took the box that they needed to take it. I'm like bro they're lying to you. (*MAJEAU then retrieved a suspected cash parcel from the passenger side of the* UPS delivery vehicle *and placed the suspected cash parcel in the open rear hatch of the Lamborghini*)

HERNANDEZ:    (*Laughing*)

MAJEAU:    (*MAJEAU returns to the passenger side of the UPS delivery vehicle*)  I'm like they're fucking lying, lying to you. Five went out. All of them arrived. He came and I showed him. Like everything,

33

|              | everything went, and everything arrived (*MAJEAU reached inside the passenger side of the UPS delivery vehicle and grabbed the second suspected cash parcel. He then placed the second suspected cash parcel in the open rear hatch of the Lamborghini and closed the hatch*). |
|--------------|--------------|
| HERNANDEZ:   | (*Laughing*) |
| MAJEAU:      | (*returns to the passenger side of the UPS delivery vehicle and remains standing just outside the open passenger side*) Bro we've been, we've been using that info for so long. |
| HERNANDEZ:   | James Paul? |
| MAJEAU:      | Yea, James Paul. He's like well cause see my friend pays somebody he knows just to like use the address and then he gets it. He goes, he goes so then who, who was at the house? He's all well his son. 19, he's 19 years old, his son, but he was at work. I'm like dude his fucking son jacked it. |
| HERNANDEZ:   | (*Laughing*) |
| MAJEAU:      | I'm like listen dog. Those people they come. They're not just picking it up and just leaving. Like, they're going to wait and see who fucking cracks it open or who comes to pick it up and drives off with it. Like, common sense. I told him bro, I'mma, I'mma ask my guy to get a printout so you can see bro there was no issue with it. |
| HERNANDEZ:   | Bro it wouldn't go out. |
| MAJEAU:      | That's what I told him. |
| HERNANDEZ:   | (*laughing*) |
| MAJEAU:      | They'll come get it. (*MAJEAU took a folded piece of paper from his left front pants pocket and unfolded it*). |
| HERNANDEZ:   | Let me take a picture so I could get a printout |

MAJEAU:          Or take it with you. I don't know, or
                 you know, take a picture. It's just the
                 bottom of it. (*MAJEAU holds the paper
                 out towards HERNANDEZ with both hands.
                 HERNANDEZ takes a picture of the piece
                 of paper*) Just get a printout. He's
                 gonna pay for it (*MAJEAU then folded
                 the piece of paper back up and places
                 it back in his front left pants
                 pocket*).

                 . . .

MAJEAU:          I said and how is it that, I showed
                 him. How is that I, I sent out five
                 boxes. Look at where they all went. Ok,
                 all them are right. We can run numbers
                 right now.

HERNANDEZ:       And one went to like a business bro
                 like…

MAJEAU:          Oh yea.

HERNANDEZ:       …like businesses where they can show
                 up, Hey what's up. Like bro

MAJEAU:          Yea that's what I told him.

HERNANDEZ:       (*laughing*)

MAJEAU:          I go look at all my shit. Look at
                 everywhere. I go we came, we, we've
                 been coming here for over a fucking
                 year.

HERNANDEZ:       Like it's been a long time.

MAJEAU:          Long time bro.

HERNANDEZ:       Long ass time.

MAJEAU:          (*Unintelligible*)

HERNANDEZ:       Like 2, 3 years. Na.

59.  In the foregoing conversation, agents believe
HERNANDEZ and MAJEAU were discussing the UPS parcel which had
been seized by DEA Hartford investigators, discussed earlier in
this section.  MAJEAU stated not only the city and state where

35

the parcel was destined, but the name of the individual to whom the parcel had been addressed. MAJEAU then proceeded to discuss how he had sent five parcels out at the same time, one being the seized Torrington, Connecticut parcel. Investigators believe MAJEAU is referring to the five parcels investigators observed ALVAREZ provide to HERNANDEZ on August 9, 2024, discussed earlier in this section. Agents believe HERNANDEZ and MAJEAU then discuss how they have been sending drug parcels to the same Torrington, Connecticut address for the past two to three years.

60. Later, during the same above conversation, MAJEAU stated:

> "Bro. I'm like bro, I go this is what I tell him. I go there's a, no bro look real shit in the last month there's been a drought on these things. The price has gone up. Bro they've gone up like 1500. They keep going up. I go there's a fucking drought. I go obviously you might not know it because I keep getting them bro because my lines are strong. I said but people out here, everybody's asking me. Everybody's trying to get 'em from me bro and I'm just like not why am I not dealing with nobody here. Prices have been going up bro there's been a drought on these things. And I told him like when these, every time there's an issue with these things people start doing shady shit. People start jacking people. People start burning people because they can't get 'em. I said look, they gotchu. Instead of just fuckin…punk ass 19-year-old kid bro, like really?"

61. In the foregoing conversation, agents believe MAJEAU was advising HERNANDEZ that the price per kilogram of cocaine had increased $1,500 because there was less available to purchase. MAJEAU further discussed how he had a good cocaine source of supply who was able to easily supply him with cocaine needed to ship across the United States.

62.  After their conversation, MAJEAU left the area in the Lamborghini.  Investigators were able to later confirm with UPS that a second parcel, tracking number 1Z6495169077176647 purchased through the same UPS shipper account as the other suspected cash parcel, UPS shipper account 649516, had been on the UPS delivery vehicle out for delivery, but had a possibly inaccurate postage weight of .9 pounds.  Due to the weight discrepancy, the parcel had not been picked up with the known cash parcel profile.  Through the publicly accessed UPS website and UPS analytics employees, it was later discovered that both suspected cash parcels had been marked as "delivery refused" by HERNANDEZ and were never returned to the UPS Compton Center, causing the parcels to become "lost" in the UPS system, matching that of previously identified and suspected cash parcels.

63.  Based on the above-detailed evidence, agents believe that MEAJEAU met with HERNANDEZ in order to receive drug proceeds.

64.  After the encounter, MAJEAU traveled to SUBJECT PREMISES 1.  Previously seized cash and drug parcels have been encased in hardened spray foam to mask the contents of the parcel. To unpackage and verify the amount received in each cash parcel, would take an extensive amount of time.  Investigators believe MAJEAU transported the suspected drug proceeds to SUBJECT PREMISES 1 to disperse and repackage the drug proceeds in preparation for laundering the proceeds.

65.  On August 20, 2024, at approximately 12:58 p.m., HERNANDEZ was seated in the front driver's seat of the UPS

delivery vehicle and appeared to be on a telephone call with an unidentified individual.  Only HERNANDEZ's side of the conversation was captured.  The following is an excerpt of the conversation:

HERNANDEZ:    Nothing but failures, bro. Mmm, it is generating heat [unintelligible]. (*HERNANDEZ exits the UPS delivery vehicle*)

HERNANDEZ:    (*HERNANDEZ returns to the UPS delivery vehicle*) No it is tough with those dudes.

HERNANDEZ:    Yeah I guess like, there was some fool inside the pad and he just left it outside. And fuckin... he waited a while you know, and then he knocked like "ta, ta, ta" and like "Hey, what's up?" "Hey, what's up?" And then fucking [unintelligible] he said like 8 fools pull, 8 of those fuckers showed up. And he is like "What's... what's up?" "Oh hey, you know this, this right here" and he, "I don't know. It ain't mine homie."  "Alright."  They just grabbed it and took it. (*laughing*)

HERNANDEZ:    Na, that means they don't know shit.

HERNANDEZ:    Yup.

HERNANDEZ:    Yeah.

HERNANDEZ:    Yeah, yeah they were like I don't know the name. I don't know. Cause like uh, a lot of them, like remember when they got that fool in St. Lou? They were using the address that was not theirs. So the food was going and he will pick it up and leave with the shit. And then they pulled him over you know?

HERNANDEZ:    So that's what they think. They're probably thinking "Oh these fools are using addresses that aren't like to there," you know? Yeah, like they just like "Hey!" You know? So they're tryin' to figured it out. [Utterance] Cause like I can send something to your house, you know? And you don't know,

38

you're at work, bro. And I can just go get it, you know? [Utterance] you don't know, like "I don't know." Like nobody signed for it. you know? They just left it. I don't know.

HERNANDEZ:    That shit is there and [unintelligible] fuck it.

HERNANDEZ:    I told her to let me hey you need to sell that shit [unintelligible] cause let's say you send out 60 pieces, you know? They're not gonna go to fucking 60 fucking addresses bro. You know? There's no way! But hey, you know, you send 10 pieces. Eh fuckin... no well they will be there, "Hey, what's up?"

HERNANDEZ:    Shit, bro.

HERNANDEZ:    Would be his. Dick just lost fuckin a 12 pack down [unintelligible] your main office [unintelligible] [Laughs] (*HERNANDEZ exits the UPS delivery vehicle*)

HERNANDEZ:    Took a big hit. Yea 12 pack down the drain.

HERNANDEZ:    She'll write it off as a business expense.(*laughing*)


66.   In the foregoing conversation, investigators believe HERNANDEZ was again discussing the seizure of approximately 5.7 kilograms of suspected cocaine in Torrington, Connecticut, advising the individual on the other end of the conversation that the seizure was bringing attention to the drug trafficking organization.   HERNANDEZ then discussed a possible arrest that had occurred in St. Louis.   Agents believe HERNANDEZ is referring to the arrest subsequent to a controlled delivery of the drug parcel discussed in IV(A)(1) of this Affidavit. Investigators also believe HERNANDEZ suggested the DTO increase

the amount of drug parcels they ship at one time, since law enforcement would not be able to intercept every parcel due to the number of destination addresses across the United States.

### G.   SUBJECT PREMISES 1 (MAJEAU's Residence) Likely Contains Evidence of the Subject Offenses

67.   SUBJECT PREMISES 1, located at 16178 Eastridge Court, Chino Hills, California, is MAJEAU's current residence. Through information gained from the San Bernardino County Assessor-Recorder, investigators determined MAJEAU is the owner of SUBJECT PREMISES 1.   USPIS Inspectors checked United States Postal Service systems and determined that MAJEAU has been and is receiving mail through the United States Postal Service in his name at SUBJECT PREMISES 1.   According to records received from AT&T pursuant to a subpoena, the IP address 108.94.91.37 was subscribed to MAJEAU, with a service address of SUBJECT PREMISES 1.   This IP address was used to check the status of suspected drug and cash parcels shipped by the DTO from October 30, 2023, to June 23, 2024.

68.   On June 24, 2024, UPS employees advised DEA agents that three UPS parcels, UPS tracking numbers 1Z6495169076579035, 1Z6495169078720207 and 1Z6495160376409506, matching the suspected cash parcel profile, were on HERNANDEZ's UPS delivery vehicle and out for delivery.   All three tracking numbers were purchased using the UPS shipper account 649516.   All three parcels were 10 pounds and had a return address of EBW, 137 North Vendome Street, Los Angeles, California 90026.   The parcels originated from Landover, Maryland, Highland Heights,

Ohio and Newport News, Virginia.  DEA agents initiated
surveillance in the area of HERNANDEZ's UPS delivery route,
locating HERNANDEZ in his UPS delivery vehicle parked on the
north shoulder of the 6400 block of Flotilla Street in Commerce,
California.  During this time, HERNANDEZ was in the same area as
the location data and radius for Subject Cellular Telephone 2
(belonging to HERNANDEZ).

69.  Agents checked the status of the parcels using the
publicly accessed UPS website.  They observed that at 10:26
a.m., the status of one of the three parcels had changed to "the
receiver has moved.  We're attempting to obtain a new delivery
address for this receiver."  Several hours later at 1:44 p.m.,
the two remaining parcels were scanned as "delivery refused
. . . the receiver states the product was not ordered and has
refused the delivery."

70.  At approximately 2:40 p.m., the location data and
radius of Subject Cellular Telephone 1 (belonging to MAJEAU) and
Subject Cellular Telephone 2 (belonging to HERNANDEZ) began
overlapping in Commerce, California.  At approximately 2:45
p.m., investigators observed a black Mercedes, bearing
California registration 9JKC856[9] pull behind HERNADEZ's UPS
delivery vehicle.  HERNANDEZ was observed signaling the Mercedes
to park in front of the UPS delivery vehicle.  Several minutes
later, investigators observed MAJEAU exit the Mercedes, open the

_____

[9] Through DMV checks of the vehicle's registration, it was
discovered the registration belonged to a 2023 Mercedes, vehicle
identification number W1K7X6BB4PA062720, with a registered owner
of Jimmy Abraham Majeau and Dianne Tiscareno, and an address of
Subject Premises 1.

rear hatch of the vehicle and walk to the passenger side of the
UPS delivery vehicle.  MAJEAU then looked to be transferring
items to and from the UPS delivery vehicle and the Mercedes,
making approximately three trips from the UPS delivery vehicle
to the rear hatch of the Mercedes and back.

71.  Two minutes later, investigators observed MAJEAU close
the rear hatch of the Mercedes and walk back to the passenger
side of the UPS delivery vehicle.  MAJEAU and HERNANDEZ then
conversed for approximately 14 minutes.  MAJEAU remained outside
the passenger side of the UPS delivery vehicle during the
entirety of the conversation while HERNANDEZ remained in the
vehicle.  MAJEAU then returned to the Mercedes and left the
area.  Investigators attempted to surveil MAJEAU to his final
destination, but due to traffic, investigators lost sight of the
Mercedes.  Location data and radius for Subject Cellular
Telephone 1 showed MAJEAU had traveled back to the area of
SUBJECT PREMISES 1.  Investigators do not believe he made any
stops until reaching SUBJECT PREMISES 1.

72.  UPS employees advised agents that the three
aforementioned parcels were never scanned back into the UPS
Compton Center.  Based on the information provided by UPS
regarding the target parcel, previous money seizures, and the
observations made by agents, investigators believe MAJEAU met
with HERNANDEZ to receive three boxes containing drug proceeds,
which had been sent from three states in which suspected drug
parcels have been identified as being shipped to by this DTO.

Investigators believe MAJEAU then transported the suspected drug proceeds back to SUBJECT PREMISES 1.

73.    Several photographs seized from MAJEAU's iCloud[10] account contained metadata which showed that the photos were taken at SUBJECT PREMISES 1.  Additionally, photographs which did not contain location data were located, but are believed to be stored at SUBJECT PREMISES 1 due to the value and sensitivity of the items and information.  These photographs revealed that evidence and proceeds relevant to the Subject Offenses were located at SUBJECT PREMISES 1:

a.    The below three photographs depict the use of multiple cellphones and the use of these devices to communicating tracking numbers and check the status of suspected cash and known drug parcels:

  

10 On February 27, 2024, the Honorable Rodney H. Holmes, United States Magistrate Judge for the Eastern District of Missouri, authorized a search warrant for information related to four Apple iCloud identifiers 323-895-8930 and etheamsters396@gmail.com, believed to be associated with HERNANDEZ, and 949-750-5453 and majeaujimmy1@icloud.com, believed to be associated with MAJEAU.

The first image was captured on December 13, 2023; the second was captured on January 22, 2024; and the third was captured on January 8, 2024.

      b.    Images and videos depicting high-end jewelry and bulk cash consistent with the concealment of drug proceeds (such as the below photo captured on November 27, 2022).  According to tax records, MAJEAU did not have any reported income for the 2022 tax year. Investigators believe MAJEAU purchases high-end jewelry, which can be purchased with cash, to launder his drug proceeds:



      c.    Handwritten drug and drug proceeds ledgers.  The below photos were captured on October 1 and October 13, 2020, and depict bulk United States currency packaged and bundled in a way that is indicative of drug trafficking.  Previously seized

cash parcels containing drug proceeds were wrapped in clear green plastic wrap similar to the below photo:





74. An analysis of cell-site and location information related to Subject Cellular Telephones 1 and 3 (belonging to MAJEAU and MAJEAU's Lamborghini SUV) indicated that from February 27 to September 11, 2024, Subject Cellular Telephones 1

and 3 were consistently in the approximate location of SUBJECT
PREMISES 1 overnight, as recently as the evening of September
11, 2024.  Furthermore, as previously mentioned herein, MAJEAU
returned to SUBJECT PREMISES 1 after meeting with HERNANDEZ on
August 15, 2024.

75.  Investigators believe SUBJECT PREMISES 1 is used to
process drug proceeds and to conceal substantial amounts of drug
proceeds and assets purchased using drug proceeds for the MAJEAU
DTO. Based on my training and experience, I know that those
engaged in drug trafficking and money laundering usually keep
ledgers and/or transaction records, contact lists, and other
evidence related to their criminal activity close to them and
easily accessible at any time on their persons, including their
digital devices, or in their residence.  Investigators believe
evidence of the Subject Offenses will be located at SUBJECT
PREMISES 1, including but not limited to customer lists, drug
ledgers, drug proceeds, and electronic devices -- including
computers and cellular telephones -- used to purchase and track
UPS postage and communicate with DTO members.

**H.  SUBJECT PREMISES 2 Is a MAJEAU DTO Stash Location and
Likely Contains Evidence of the Subject Offenses**

76.  SUBJECT PREMISES 2 is located at 2552 Havenpark
Avenue, South El Monte, California, and is believed to be a
stash location utilized by the MAJEAU DTO.  USPIS Inspectors
checked United States Postal Service systems and determined that
MAJEAU has been and is receiving mail through the United States
Postal Service in his name at SUBJECT PREMISES 2.

77.  According to location information for Subject Cellular Telephone 1 (belonging to MAJEAU), on March 13, 2024, at approximately 3:30 p.m., Subject Cellular Telephone 1 arrived in the area of SUBJECT PREMISES 2.  At approximately 4:50 p.m., Subject Cellular Telephone 1 left the area and traveled to the area of Commerce, California. Subject Cellular telephone 1 stayed in the area of Commerce, California until approximately 5:30 p.m. before departing.  During that time, location information shows that Subject Cellular Telephone 2 (belonging to HERNANDEZ) was in the same vicinity as Subject Cellular Telephone 1 (MAJEAU).  Subject Cellular telephone 1 then traveled back to the area of SUBJECT PREMISES 2 at approximately 6 p.m., where it remained until approximately 8:20 p.m.  It was later discovered through UPS databases that on February 16, 2024, a UPS shipping label, tracking number 1Z6495169077811236, was purchased and was not scanned into the UPS system until March 7, 2024.

78.  On March 7, 2024, the above-mentioned parcel was scanned as received by UPS in Watertown, CT.  On March 13, 2024, at 5:52 p.m., the status of the parcel was changed to undeliverable, "delivery refused by receiver," by HERNANDEZ. The suspect parcel was never scanned back into the UPS system.  The parcel had the same characteristics of the two parcels containing United States currency discussed in Section IV(D) of this affidavit. Due to the characteristics of the parcel, investigators believe the parcel had contained United States currency, which were suspected drug proceeds.  Investigators

also believe HERNANDEZ had changed the status as undeliverable after providing the parcel to MAJEAU in an effort to thwart law enforcement detection.

79.  On March 15, 2024, at approximately 1:40 p.m., Subject Cellular Telephone 1 again arrived in the area of SUBJECT PREMISES 2.  At approximately 2:50 p.m., Subject Cellular Telephone 1 left the area and began traveling towards Commerce, California.  Based on the location data from Subject Cellular Telephones 1 and 2, it is believed that MAJEAU and HERNANDEZ met in Commerce, California for a short period of time.  At approximately 3:20 p.m., Subject Cellular Telephone 1 left the area and began traveling back towards SUBJECT PREMISES 2, arriving at approximately 4:10 p.m.

80.  Analysis of location data for Subject Cellular Telephone 1 showed that between February 27, 2024, and September 9, 2024, Subject Cellular Telephone 1 had been in the area of SUBJECT PREMISES 2 on over 279 occasions.

81.  Investigators believe SUBJECT PREMISES 2 to be a stash location used by the DTO.  Drug traffickers will often use secondary locations to hide drug proceeds or process and package narcotics.  Based on the timing of the meeting, and subsequent travel of MAJEAU, investigators believe that MAJEAU and HERNANDEZ met in order to deliver narcotics and/or narcotics proceeds, which MAJEAU then brought to SUBJECT PREMISES 2, the suspected stash house.

82.  On June 25, 2024, between 12:20 p.m. and 12:30 p.m., Subject Cellular Telephone 1 left the area of Hacienda Heights

and traveled to the area of SUBJECT PREMISES 2.  The location
data for Subject Cellular Telephone 1 stayed in the area of
SUBJECT PREMISES 2 from 12:30 p.m. to 5:20 p.m.  This was the
day after MAJEAU had procured three suspected cash parcels from
HERNANDEZ, as discussed in Section IV(E) of this affidavit.

83.  At approximately 2:33 p.m., investigators observed a
gold Mitsubishi SUV, bearing California registration 9FMA208[11],
backed into the driveway of SUBJECT PREMISES 2.  Enterprise
Rental Car advised that the vehicle had been rented as of that
date by ALVAREZ.  ALVAREZ had provided an address of SUBJECT
PREMISES 6 and two contact phone numbers, 213-761-3908 and 626-
703-2244.

84.  Investigators believe MAJEAU transported the suspected
drug proceeds to SUBJECT PREMISES 2, to disperse and repackage
the drug proceeds for transportation, and that the drug proceeds
were then provided to ALVAREZ for transportation to their
intended recipients.

85.  Based on my training and experience, I know that drug
traffickers will often utilize rental vehicles to transport
drugs and drug proceeds in an effort to thwart law enforcements
investigative efforts and to make it more difficult to track and
surveil DTO members.  In doing so, it makes it more difficult
for law enforcement to track known vehicles registered or used
by DTO members through law enforcement databases.

---

[11] Through DMV checks of the vehicle's registration, it was
discovered the registration was for a 2023 Mitsubishi utility
vehicle, vehicle identification number JA4J3UA85PZ029842, with a
registered owner of EAN Holdings.

86.  Additionally, through phone toll analysis, investigators determined that ALVAREZ's cellular telephone was in contact with Subject Cellular Telephone 1 (MAJEAU) that evening.

87.  On August 23, 2024, at approximately 6:46 p.m., location data shows that Subject Cellular Telephone 1 began traveling towards the area of Commerce, California.  At approximately 6:56 p.m., Subject Cellular Telephone 1 began overlapping with the location of Subject Cellular Telephone 2 in Commerce, California.

88.  While conducting physical surveillance, investigators observed the HERNANDEZ's UPS delivery vehicle backed into the loading dock of 6565 E. Washington Blvd, Commerce, California.  At approximately 7:00 p.m., investigators observed a white Lamborghini, bearing California license plate 8XRF034, known to be driven by MAJEAU, traveling northwest on Gayhart Street from Davie Avenue.

89.  At approximately 7:03 p.m., while monitoring the audio and video located in HERNANDEZ's UPS delivery vehicle, investigators observed HERNANDEZ enter the rear cargo hold of the UPS delivery vehicle and grab a brown box with what looked to be a white label affixed to the top.  HERNANDEZ then exited the open passenger door of the UPS delivery vehicle with the box and left the camera's view.

90.  HERNANDEZ began conversing with MAJEAU, who advised that he had been in North Hollywood prior to his arrival.  Investigators did not hear any other voices besides those of

HERNANDEZ and MAJEAU and no other vehicles were seen by physical surveillance investigators.  After the brief conversation, HERNANDEZ entered the UPS delivery vehicle through the passenger door without the brown box.  Several seconds later, HERNANDEZ left the area.

91.  At approximately 7:16 p.m., Subject Cellular Telephone 1 travelled out of Commerce, California area.  At approximately 8:16 p.m., Subject Cellular Telephone 1 was in the vicinity of SUBJECT PREMISES 2.  Subject Cellular Telephone 1 remained in the area of SUBJECT PREMISES 2 until approximately 9:06 p.m., when it appeared to travel back to the vicinity of SUBJECT PREMISES 1.

92.  Several photographs seized from MAJEAU's iCloud account contained metadata which showed that the photos were taken at SUBJECT PREMISES 2.  Analysis of additional photos not containing metadata are believed to be taken at the same location based on consistent similarities. These photographs revealed that evidence relevant to the Subject Offenses were located at SUBJECT PREMISES 2:

a.  The below still photographs of seized videos, depicting bulk United States currency, captured on October 6, 2022, and October 16, 2023, respectively:





b.    The below photographs, depicting what is believed to be kilograms of cocaine. The photograph on the left shows a left-hand tattoo consistent with MAJEAU's known tattoos, captured on January 30, 2024, and April 4, 2023, respectively:

 

      c.   Additional photographs with unknown location data depicted handwritten legers consisting of names and addresses consistent with previously identified suspected drug parcels. The following photograph was captured on December 26, 2023:



93.  Additionally, based on records obtained from Block,
Inc., SUBJECT PREMISES 2 is associated with MAJEAU's Cash App
account.  Through DMV checks it was determined that SUBJECT
PREMISES 2 is listed as the address on MAJEAU's California
driver's license.  According to records received from T-Mobile,
Subject Cellular Telephone 1 (belonging to MAJEAU) was
subscribed to "High Desert Sweeping," with SUBJECT PREMISES 2
listed as the billing address.  An analysis of cell-site and
location information related to Subject Cellular Telephone 1
indicated that MAJEAU was physically near SUBJECT PREMISES 2 as
recently as September 9, 2024.

94.  Investigators believe SUBJECT PREMISES 2 is used to process and package drugs and drug proceeds. Additionally, investigators believe evidence of the Subject Offenses will be located at SUBJECT PREMISES 2, including but not limited to customer address lists, drug ledgers, drug proceeds, drugs to include cocaine and methamphetamine, packaging material and electronic devices -- including computers and cellular telephones -- used to purchase and track UPS postage. Investigators also believe SUBJECT PREMISES 2 is used to process and package drugs as well as drug proceeds.

**I.    SUBJECT PREMISES 3 (HERNANDEZ's Residence) Likely Contains Evidence of the Subject Offenses**

95.  SUBJECT PREMISES 3 is located at 2211 East Orangewood Avenue, Apartment 467, Anaheim, California, and is believed to be a residence of HERNANDEZ.  USPIS Inspectors checked United States Postal Service systems and determined that HERNANDEZ has been and is receiving mail in his name at SUBJECT PREMISES 3.

96.  On September 3, 2024, at approximately 1:58 p.m., during the interception of oral communications as well as visual, non-verbal conduct, investigators observed HERNANDEZ in the rear cargo hold of the UPS delivery vehicle speaking to Individual 4 at Piccone Apparel, 6444 Fleet Street, Commerce, California.  The following is an excerpt of the conversation:

HERNANDEZ:      And then I thought I'd see him
                yesterday but,  nothing

INDIVIDUAL 4:  Nada

HERNANDEZ:      No

INDIVIDUAL 4:  Crazy

HERNANDEZ:      I still have it.

INDIVIDUAL 4:   Does he know you have it?

HERNANDEZ:      You know what, I don't know because…

INDIVIDUAL 4:   He didn't even, he didn't tell you
                about it no?

HERNANDEZ:      Yea, he told me about it.

INDIVIDUAL 4:   Oh okay

HERNANDEZ:      And then he never came and then
                remember they pulled my truck.

INDIVIDUAL 4:   Yea, yea, yea.

HERNANDEZ:      So it never went through the system
                again.

INDIVIDUAL 4:   Yea, yea, yea.

HERNANDEZ:      It never said out for delivery mi
                madre's.

INDIVIDUAL 4:   Yea.

HERNANDEZ:      It just like…

INDIVIDUAL 4:   You just took it.

HERNANDEZ:      It just vanished.

INDIVIDUAL 4:   Crazy.

HERNANDEZ:      So maybe he thinks it vanished? I don't
                know.

INDIVIDUAL 4:   Yea.

HERNANDEZ:      I don't fucking know .

INDIVIDUAL 4:   That's crazy.

HERNANDEZ:      And I didn't have nothing today.

INDIVIDUAL 4:   Yea.

HERNANDEZ:      I don't know.

INDIVIDUAL 4:   I don't know.

HERNANDEZ:      He all spooked though.

INDIVIDUAL 4:   Yea? He is?

HERNANDEZ:       Yea I can tell. I can just fucking
                tell.

                . . .

HERNANDEZ:       Na, I haven't seen my buddy. I'm just
                like well, fuck it I'm gonna crack it
                open. (*laughing*)

INDIVIDUAL 4:   (*laughing*) See whatchu got?

HERNANDEZ:       See whatchu got in here.

INDIVIDUAL 4:   Damn.

HERNANDEZ:       Fuck it, you're all scared. He was at
                the beach. I thought for sure he'd hit
                me up yesterday, like hey what's up?

INDIVIDUAL 4:   Y nada?

HERNANDEZ:       Nada. He was at the beach with his kid.
                I go, I highly doubt he's at the beach
                at 10am. I'm sure he got there later,
                like maybe one. Cause I was waiting for
                him, like hey lets hit the gym.

97.  In the foregoing conversation, investigators believe
HERNANDEZ is referring to a suspected cash parcel that MAJEAU
had not picked up from HERNANDEZ.  Agents believe HERNANDEZ is
holding the suspected cash parcel at SUBJECT PREMISES 3, as a
stash location, until MAJEAU contacts him to take possession of
the drug proceeds.

98.  Investigators believe several photographs seized from
HERNANDEZ's iCloud account show that evidence relevant to the
Subject Offenses will be located at SUBJECT PREMISES 3,
including:

       a.  The below photographs, depicting bulk high-end
jewelry commonly purchased by drug traffickers to obfuscate and

launder their drug proceeds.  The photographs were captured on August 9, 2023, August 19, 2023, and January 5, 2024, respectively.  The below watches are worth just less than approximately $1 million:

  

b.  Photographs of numerous firearms, captured on October 5, 2023, April 15, 2023, and December 1, 2023, respectively:

  

99.  On July 24, 2024, investigators received leasing information related to SUBJECT PREMISES 3 from Lyon Living, the property management company.  The information revealed that

58

HERNANDEZ was the lessee for SUBJECT PREMISES 3 and had moved in on August 8, 2023.  Employees advised that HERNANDEZ had renewed his lease until August 7, 2025.

100. An analysis of cell-site and location data related to Subject Cellular Telephone 2 (belonging to HERNANDEZ), indicated that from February 27 to September 10, 2024, Subject Cellular Telephone 2 has consistently split time between the approximate location of SUBJECT PREMISES 3 and SUBJECT PREMISES 4 during the overnight hours, the most recent evening being September 10, 2024.

101. Based on my training and experience, I know that those engaged in drug trafficking and money laundering usually keep ledgers and/or transaction records, contact lists, and other evidence related to their criminal activity close to them and easily accessible at any time on their persons, including their digital devices, or in their residence.  Investigators believe evidence of the Subject Offenses will be located at SUBJECT PREMISES 3, including but not limited to customer address lists, drug ledgers, drug proceeds, and electronic devices -- including computers and cellular telephones -- used to purchase and track UPS postage.

**J.   SUBJECT PREMISES 4 (HERNANDEZ's Secondary Residence) Likely Contains Evidence of the Subject Offenses**

102. SUBJECT PREMISES 4 is located at 1235 South McBride Avenue, East Los Angeles, California, and believed to be the secondary residence of HERNANDEZ.  On HERNANDEZ's rental application for SUBJECT PREMISES 3, HERNANDEZ provided SUBJECT

PREMISES 4 as his current address and advised that he was the
owner of the property and had resided there since June 3, 1991.
USPIS Inspectors checked United States Postal Service systems
and determined that HERNANDEZ has been and is receiving mail
through the United States Postal Service in his name at SUBJECT
PREMISES 4.  The last package received in HERNANDEZ's name at
SUBJECT PREMISES 4 through USPS was delivered on July 23, 2024.

103. On September 3, 2024, at approximately 8:23 p.m.,
during the interception of oral communications as well as
visual, non-verbal conduct, investigators observed HERNANDEZ
seated in the front driver's seat of the UPS delivery vehicle on
a telephone call with an unidentified individual.  Only
HERNANDEZ's side of the conversation was captured.  The
following is an excerpt of the conversation:

> HERNANDEZ:    The smartest thing would have been
> like, for the girl never to come and
> had me let, yea like and had me like
> have someone go pickup everything. And
> then like go pick it up like later
> during the week. And then like have my
> cousin, my cousin come get it, stash it
> at his pad and then at the end of the
> Friday go pick everything up. Then send
> the errand girl to my spot and then get
> everything you know and go.

> HERNANDEZ:    Everyday, everyday, everyday, you know
> that was dumb bro. That was like, like,
> you know like.

104. In the foregoing conversation, investigators believe
HERNANDEZ is explaining to an unidentified individual that
MAJEAU should not have used ALVAREZ to pick up the drug parcels
and deliver them to HERNANDEZ.  He suggested that instead,
HERNANDEZ could have picked up the drug parcels from MAJEAU and

used his cousin to hold the parcels at his residence until that Friday.  HERNANDEZ would then pick up the drug parcels from his cousin and bring them to what agents believe to be SUBJECT PREMISES 4 because it is approximately a six minute, 2.4 mile, drive to HERNANDEZ's UPS delivery route.  He would then have ALVAREZ pick up the parcels from SUBJECT PREMISES 4 and bring them to HERNANDEZ while he was making deliveries along his UPS route.

105. Several photographs seized from HERNANDEZ's iCloud account contained metadata which showed that the photos were taken at SUBJECT PREMISES 4.  Analysis of additional photos not containing metadata are believed to be taken at the same location based on consistent similarities. These photographs revealed that evidence relevant to the Subject Offenses were located at SUBJECT PREMISES 4, including:

a.    The below photograph, depicting bulk United
States currency bundled consistent with drug trafficking,
captured on April 17, 2023:



b.    The below photograph captured on January 8, 2023,
is believed to have been take at SUBJECT PREMISES 4.   The
"bricks" of cocaine seized by investigators throughout this
investigation have been wrapped in clear green plastic wrap,

consistent with the roll of plastic wrap shown and circled in
the bottom left corner of the below photograph:



106. As noted above, an analysis of cell-site and location
data related to Subject Cellular Telephone 2 (belonging to
HERNANDEZ), indicated that from February 27 to September 9,
2024, Subject Cellular Telephone 2 has consistently split time
between the approximate locations of SUBJECT PREMISES 3 and
SUBJECT PREMISES 4 during the overnight hours.

107. Based on records obtained from Block, Inc., SUBJECT
PREMISES 4 is listed as the address associated with HERNANDEZ's
Cash App account.  Through DMV checks it was determined that
SUBJECT PREMISES 4 is listed as the address associated with
HERNANDEZ's California driver's license and the listed address
on his UPS employment record.

108. Investigators believe evidence of the Subject Offenses will be located at SUBJECT PREMISES 4, including but not limited to customer address lists, drug ledgers, drug proceeds, packaging material and electronic devices -- including computers and cellular telephones -- used to purchase and track UPS postage.

**K.    SUBJECT PREMISES 5 Is a MAJEAU DTO Stash Location and Is Likely to Contain Evidence of the Subject Offenses**

109. SUBJECT PREMISES 5 is a marijuana dispensary, "OG Nation," located at 12010 Ramona Boulevard #1, El Monte, California, and is believed by law enforcement to be a stash location utilized by the MAJEAU DTO to facilitate money laundering.

110. A law enforcement analysis of cell-site and location data related to Subject Cellular Telephone 1 (belonging to MAJEAU) indicated that Subject Cellular Telephone 1 has traveled to and spent time at the approximate location of SUBJECT PREMISES 5.

111. Several photographs seized from MAJEAU's iCloud account showed that MAJEAU has access to SUBJECT PREMISES 5. These photographs revealed that evidence relevant to the Subject Offenses were located at SUBJECT PREMISES 5, including:

a.    The below photograph depicting bundled bulk currency and a letter showing a payment for 5% ownership in Sig-El Monte LLC, OG Nation and the business licenses associated with SUBJECT PREMISES 5.  The photograph is believed to have been taken at SUBJECT PREMISES 2 and the currency used for this

payment is believed to be drug proceeds.  The bulk United States currency is bundled in a manner that is indicative of drug trafficking and similar to seized parcels which had contained suspected drug proceeds:




b.    The below photographs, captured on July 24, 2023, and September 12, 2023, respectively, showing MAJEAU has access to computer systems and documents at OG Nation locations. The photos depict an abundance of OG Nation merchandise, paperwork with the letters "OG," surveillance cameras which depict the exterior of a building with the sign "OG NATION" with

the key consistent with that of a Bentley vehicle known to be operated by MAJEAU:

 

112.    As discussed in Section IV(E) of this affidavit, MAJEAU's Instagram profile, "majesty_jm," has the Instagram for OG Nation El Monte, "ognationelmonte," linked in the bio of his profile. Investigators believe MAJEAU is promoting the businesses by linking the profiles in his bio. He also adds numerous posts to his Instagram story depicting OG Nation and SUBJECT PREMISES 5.  MAJEAU posts photographs and promotes OG Nation El Monte regularly in his Instagram story and spends a significant amount of time in the area of OG Nation El Monte, according to location data from Subject Cellular Telephone 1.

113. Based on my training and experience, I know that those engaged in drug trafficking and money laundering usually keep ledgers and/or transaction records, contact lists, and other evidence related to their criminal activity close to them and easily accessible at any time, including computer systems. Drug traffickers will often invest in or utilize business that receive a majority of their revenue in cash. This makes it easier to obfuscate proceeds earned through the sale of illicit drugs and make them look legitimate. Marijuana dispensary businesses are cash heavy businesses which make the process of obfuscating illicit funds effortless. Investigators therefore believe evidence of the Subject Offenses will be located at SUBJECT PREMISES 5, including but not limited to money ledgers, drug proceeds, and electronic devices -- including computers and cellular telephones.

**L.   SUBJECT PREMISES 6 (ALVAREZ's Residence) Likely Contains Evidence of the Subject Offenses**

114. SUBJECT PREMISES 6 is located at 17548 East Orlon Drive, Rowland Heights, California and believed to be the residence of ALVAREZ. USPIS Inspectors checked United States Postal Service systems and determined that ALVAREZ has been and is receiving parcels through the United States Postal Service in her name at SUBJECT PREMISES 6 as of April 2024.

115. On July 25, 2024, at approximately 8:00 a.m., Pasadena Police Department detectives were following a Ford Mustang Mach E, license plate 9LEB743, driven by a narcotics suspect ("CD-1") who is under investigation for transporting and distributing

multi-kilogram quantities of cocaine and receiving narcotics proceeds.

116. At approximately 10:00 a.m., CD-1 drove into a plaza located at 4200 Chino Hills Pkwy, Chino Hills.  CD-1 met up with ALVAREZ, who was driving, a white Audi, bearing California license plate 8XCC820.[12] CD-1 proceeded to hand off a weighted cardboard box to ALVAREZ.  ALVAREZ placed the cardboard box inside her vehicle and left the area.  According to Pasadena Police Department detectives, during past exchanges they have observed, CD-1 has used similar cardboard boxes to handoff cocaine to several different subjects. Pasadena Police Detectives have seized a total of 200 kilograms of cocaine and 6 kilograms of heroin during the past incidents.  Based on the above, investigators believe CD-1 provided narcotics to ALVAREZ.

117. On July 30, 2024, Pasadena detectives made contact with CD-1, who was in possession of 12 kilograms of cocaine and 6 pounds of heroin.  CD-1 admitted to handing off approximately 20 kilograms of cocaine to ALVAREZ on three different occasions, for a total of approximately 60 kilograms of cocaine. Investigators believe the 60 kilograms of cocaine was intended for MAJEAU.  Through intercepted communications in and around HERNANDEZ's UPS vehicle, investigators learned that ALVAREZ is the main drug and money courier for the MAJEAU DTO.

---

[12] Through DMV checks of the vehicle's registration, it was discovered that it came back to a 2021 four door Audi, vehicle identification number WUAAWCF52MA904040, with a registered owner of Andrea ALVAREZ at SUBJECT PREMISES 6.

118. On August 7, 2024, Pasadena Detectives were conducting surveillance of ALVAREZ, who was again operating the white Audi. At approximately 10:07 a.m., ALVAREZ drove into the same plaza located at 4200 Chino Hills Parkway, Chino Hills.  She parked in a marked parking space and met up with an unidentified male who exited a white Ford Ranger, bearing California license plate 62842X3.  ALVAREZ stayed inside the white Audi as she talked to the unidentified male.  The unidentified male retrieved a black plastic storage bin with a yellow top from the bed of the pickup truck and placed the storage bin inside the trunk of the white Audi.  ALVAREZ drove away as the unidentified male entered the Ford Ranger and drove in the opposite direction.

119. On August 20, 2024, Pasadena Police Department Detectives began surveillance at SUBJECT PREMISES 6.  At approximately 1:00 p.m., investigators observed ALVAREZ exit SUBJECT PREMISES 6 and enter the white Audi.  ALVAREZ then drove away from SUBJECT PREMISES 6 in the white Audi.

120. Investigators surveilled ALVAREZ to the Fashion District in downtown Los Angeles, an area known to law enforcement for laundering of narcotics proceeds.  ALVAREZ subsequently parked along the east curb to the front of 930 Towne Avenue and remained in the White Audi.

121. At approximately 1:56 p.m., investigators observed an unidentified Hispanic male on a bicycle approach the front passenger door of the white Audi and lean through the open front passenger window.  After a short time, the trunk of the white Audi opened as the Hispanic male began walking towards the trunk

area.  ALVAREZ exited the vehicle, and investigators approached and detained ALVAREZ.

122. Investigators asked ALVAREZ if she had any narcotics located inside the white Audi, to which she replied no, but she explained that she had United States currency inside a box located inside the trunk of the vehicle.  ALVAREZ provided investigators with consent to search the white Audi. Investigators discovered a closed multicolor cardboard box approximately located inside the trunk of the vehicle.  Located inside the box were multiple bindles of bulk United States currency wrapped in multiple rubber bands inside a white plastic bag, consistent with the packaging and bundling of drug proceeds.  Investigators subsequently seized the United States currency, totaling $180,690.  ALVAREZ denied ever receiving narcotics or cocaine and denied ownership of the United States currency located in the trunk of the white Audi, however she admitted to transporting large amounts of United States currency in the past.  Investigators believe the $180,690 was drug proceeds ALVAREZ was handing off to a suspected money laundering organization or source of supply for the MAJEAU DTO.

123. On July 25, 2024, Pasadena Police Department detectives installed a GPS tracking device on the white Audi, pursuant to a California State search warrant.  An analysis of GPS information related to the whereabouts of the white Audi indicated that from July 25, 2024, to August 20, 2024, the white Audi was consistently in the approximate location of SUBJECT PREMISES 6 overnight.  On September 12, 2024, investigators

70

conducted surveillance of SUBJECT PREMISES 6.  While conducting surveillance, investigators observed the white Audi registered to ALVAREZ parked directly in front of SUBJECT PREMISES 6. Through DMV checks it was determined that SUBJECT PREMISES 6 is listed as the address associated with ALVAREZ's California driver's license and the listed address on the registration for her white Audi SUV.

124. Based on my training and experience, I know that those engaged in drug trafficking and money laundering usually keep ledgers and/or transaction records, contact lists, and other evidence related to their criminal activity close to them and easily accessible at any time on their persons, including their digital devices, or in their residence.  Investigators believe evidence of the Subject Offenses, to include but not limited to, ledgers, banking documents, deposit slips, bank account information, and information regarding additional companies initiated with the purpose of laundering drug proceeds will be located at SUBJECT PREMISES 6.

125. Through phone toll analysis, it was discovered that ALVAREZ's cellphone has been in regular contact with Subject Cellular Telephone 1 (belonging to MAJEAU).  From January 9, 2024, to August 15, 2024, ALVAREZ has been in contact with Subject Cellular Telephone 1 on 163 occasions.  Investigators believe ALVAREZ is in contact with MAJEAU to coordinate the transportation of drugs and drug proceeds in furtherance of the subject offenses.

**M.   The SUBJECT VEHICLE Likely Contains Evidence of the Subject Offenses**

126. The SUBJECT VEHICLE is described as a 2021 white BMW 840i, bearing California license plate number 9EZU530, vehicle identification number WBAGV2C07MCF98194, with a registered owner of Daniel Pantoja, 5253 1/2 Via Campo Street, Los Angeles, California, believed to be utilized by HERNANDEZ in furtherance of the Subject Offenses.

127. On September 2, 2024, investigators installed a GPS tracker on the SUBJECT VEHICLE, pursuant to a California state search warrant.  GPS locations for the SUBJECT VEHICLE have been found within the Central District of California since that time.

128. Several photographs seized from HERNANDEZ's iCloud account showed that photos were taken in his vehicle. These photographs revealed that evidence relevant to the Subject Offenses will be located at the SUBJECT VEHICLE:

a.   The below photographs, captured on July 11, 2021, and September 21, 2021, depict bulk United States currency:

 

b.   The below photograph, captured on November 2, 2022, depict a firearm in what is believed to be the center console of a vehicle:



129. During numerous surveillance operations, HERNANDEZ has been the only individual seen operating the SUBJECT VEHICLE. The SUBJECT VEHICLE has been seen parked at SUBJECT PREMISES 3 and 4 when Subject Cellular Telephone 2 (belonging to HERNANDEZ) has been in the area of the locations. Additionally, HERNANDEZ has told UPS security personnel that he is the owner of the SUBJECT VEHICLE.

130. Based on my training and experience, I know that those engaged in drug trafficking and money laundering usually keep ledgers and/or transaction records, contact lists, and other evidence related to their criminal activity close to them and easily accessible at any time on their persons, including in their vehicles. Drug traffickers also have firearms readily accessible for use during the transportation of drugs and drug proceeds. Investigators believe evidence of the Subject Offenses will be located in the SUBJECT VEHICLE, including but not limited to customer address lists, drug ledgers, drug proceeds, firearms and electronic devices.

**N.    SUBJECT PERSONS 1-4 (MAJEAU, HERNANDEZ, WARD, and ALVAREZ) Are Likely to Have in Their Possession Evidence of the Subject Offenses**

131. As detailed above, MAJEAU, HERNANDEZ, WARD, and ALVAREZ are believed to hold a leadership role within the MAJEAU DTO as described in detail in this affidavit. They not only distribute drugs across the United States, but are also engaged in money laundering techniques, including but not limited to the use of money couriers, money laundering organizations, purchase of commodities, and gambling. Through interceptions of visual,

non-verbal conduct within and around HERNANDEZ's UPS delivery vehicle, it was discovered that both HERNANDEZ and MAJEAU are heavily involved in sports betting and gambling by their own admissions.

132. Investigators have conducted queries into financial databases designated to assist law enforcement. In conducting these queries, investigators found that MAJEAU has multiple properties and both MAJEAU and HERNANDEZ have companies associated with them.

133. Through subpoenaed records, it was discovered that HERNANDEZ controls a business, 24K Chicken, LLC, based in Los Angeles, and its business bank account at Bank of America. This business was formed in the state of California in May 2021 and the formation paperwork lists HERNANDEZ as a managing member of the business, which Secretary of State filings describe as an "import/export goods service." Through open-source research, investigators determined the business has little legitimate business footprint on the internet or in public records that would explain its purpose.

134. A review of the Bank of America accounts for HERNANDEZ and his business showed that between December 2020 and February 2024, these accounts received approximately $318,000 in cash deposits, in addition to HERNANDEZ's wages from his employment with UPS of approximately $130,000 per year. Much of these cash proceeds were subsequently spent on what appear to be personal expenses at stores, restaurants, gas stations, etc. In addition, a significant amount was sent via Zelle to several

individuals, including Daniel Pantoja and Nicole Rashidi. Pantoja is a fellow UPS employee. Rashidi's precise relationship to HERNANDEZ is unknown. Both Pantoja and Rashidi's personal bank accounts also received significant cash deposits over the same time period.

135. During surveillance operations in December 2023 and May 2024, investigators observed HERNANDEZ operating the SUBJECT VEHICLE. Through DMV checks of the vehicle's registration, it was discovered that the registered owner of the BMW was Daniel Pantoja. Investigators know that drug traffickers will frequently register vehicles in other individuals' names to make law enforcement detection more difficult and to avoid property seizures.

136. Through subpoenaed records, investigators learned MAJEAU has two business accounts, identified as Ape Ish, LLC, and Majeau Limited Liability Co, along with personal bank accounts. Ape Ish, LLC and Majeau Limited Liability Co. both have business bank accounts at Wells Fargo Bank. Filings with the California Secretary of State show that Ape Ish, LLC was formed in November 2020 and its stated business purpose is "apparel and lifestyle brand." Open-source research revealed that Ape Ish, LLC is a brand name for marijuana products and related paraphernalia. Filings with the California Secretary of State show Majeau Limited Liability Co. was formed in June 2020. MAJEAU is listed as the sole member of the LLC; the type of business is listed as "real estate purchases."

137. Analysis of the financial records showed that between January 2021 and February 2024, MAJEAU deposited $368,000 in cash and $121,000 in money orders into the Ape Ish, LLC, Wells Fargo business account, and $142,000 in cash and $33,000 in money orders into the Majeau Limited Liability Co. Wells Fargo business account. Debits from the Ape Ish, LLC account consist largely of payments to cannabis vendors, wires to Chinese companies for unknown purposes, and transfers of funds to MAJEAU's personal account. Debits from the MAJEAU Limited Liability Co. account largely consist of payments to various California real estate development firms.

138. Investigators are aware that the use of cash businesses is a commonly utilized technique by narcotics traffickers to launder their illicit profits from narcotics sales. Narcotics traffickers will deposit drug proceeds into these business accounts in an attempt to conceal these funds to thwart law enforcement detection.

139. Analysis of MAJEAU's personal Wells Fargo Bank account revealed that from January 2021 to February 2024, MAJEAU deposited approximately $993,000 in cash and $54,000 in money orders into the account. These funds were spent largely on personal living expenses, including mortgage and vehicle payments, credit card payments, and transfers via Zelle and Cash App to various individuals for unknown purposes.

140. In April 2022, MAJEAU paid approximately $391,000 in cash to a vehicle financing company in California called Redline Acceptance for a payoff of "car stock." A few days later, a

luxury vehicle dealer sent MAJEAU a check for $305,000 that was deposited to MAJEAU's personal bank account at Wells Fargo Bank. Approximately one month later, in May 2022, MAJEAU wired $426,000, largely funded by the deposit of the $305,000 check from the dealer to a California title company, for the purchase of SUBJECT PREMISES 1.

141. Through subpoenaed records, it was discovered that ALVAREZ is a listed member and organizer for a limited liability company registered with the state of California called Reign Realty and Investments, LLC ("Reign"). She is a signatory, along with Individual 5, on a business bank account at U.S. Bank in the name of Reign. That account received cash deposits of $10,080 on September 28, 2023, $11,900 on December 11, 2023, and $11,400 on January 8, 2024. Individual 6 conducted portions of these cash deposits. Individual 6's personal residence identified on her California driver's license is the same address listed on the state registration paperwork for Reign.

142. Individual 7 is listed with the California Secretary of State as the registered agent for Reign. He holds one joint account at Wells Fargo Bank with Individual 6 and Individual 8. The relationship among these three individuals is unknown. Individual 6 and Individual 8 each also have their own separate personal bank accounts at Wells Fargo. On May 17, 2024, a cash deposit occurred in each of these three bank accounts, all at or under $10,000. The separate deposits occurred at three different Wells Fargo Bank branches in the Los Angeles, California area and appear to have been structured in

order to avoid the federal currency reporting threshold of $10,000 per day.  The cash deposit proceeds were then used to purchase three different cashier's checks in the amounts of $10,000, $9,980, and $9,773, all payable to Reign.  All three cashier's checks were deposited into the account of Reign at U.S. Bank.

143. Through seized text messages from MAJEAU's iCloud, it was discovered that individual 5 has assisted MAJEAU in the purchase of properties, managed outgoing payments and discussed unidentified accounts, believed to be used to launder drug proceeds.  Based off the movement of funds and the controlling individuals, investigators believe ALVAREZ and others are using Reign to launder drug proceeds for the MAJEAU DTO and others known and unknown.

144. Based on my training and experience, I know that those engaged in drug trafficking and money laundering usually keep close to them and easily accessible at any time on their persons, including their digital and electronic devices, the following records in order to track their transactions and current, incoming, and outgoing funds:  Books, records, correspondence, ledgers, logs, journals, accounts payable and receivable, pay-owe sheets, transaction records, contracts, letters and memoranda of agreements between potential co-conspirators, formulas, receipts, phone records, phone books, address books, notations and other papers, and any files relating to the transmission and exchange of cryptocurrency and/or other monetary instruments.

## V.  ADDITIONAL TRAINING AND EXPERIENCE REGARDING EVIDENCE ASSOCIATED WITH THE SUBJECT CRIMES

145. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

146. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers, often keep records related to their illegal activities at their residences, inside stash houses, and on their digital devices.  For example, drug traffickers often maintain books, receipts, notes, ledgers, bank records, documents, and other records relating to the manufacture, importation, exportation, transportation, ordering, sale and distribution of drugs and/or controlled substances and illegal proceeds, including invoices, shipping labels, tracking numbers, boxes, and envelopes. The aforementioned records are often maintained where drug traffickers have ready access to them, such as at their residence, stash houses, on their cell phones and other digital devices, and/or in their vehicles where they are available for reference and concealed from law enforcement.

147. Drug traffickers also commonly store drugs and drug paraphernalia, including packaging materials, cutting agents, and manufacturing tools in their residences, stash houses, storage units, and/or vehicles in order to have ready access to the drugs and/or paraphernalia in order to conduct their drug

80

trafficking business or to use those drugs personally and because they believe these locations are relatively safe.

148. As discussed above, MAJEAU, HERNANDEZ, ALVAREZ and WARD sell large quantities of illegal drugs. Drug dealers, like MAJEAU, HERNANDEZ, ALVAREZ and WARD, often keep records --- both physical and digital --- to keep track of the amounts paid and owed with respect to their customers and suppliers.  These ledgers are more commonly known as "pay/owe sheets" and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets and are frequently encoded in order to protect those involved.  Drug traffickers often keep such records on their person or in their residences, stash houses, on their cell phones and other digital devices, and/or vehicles.  Because drug traffickers generally possess large quantities of valuable drugs or cash, they often also possess firearms to protect the drugs, money, and themselves from other drug traffickers.

149. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, encrypted messaging applications and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between co-conspirators or between sellers and buyers, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cellphones of drugs they or others working with

them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

150. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data. As discussed above, photographs seized from MAJEUAU and HERNANDEZ's iCloud accounts contain metadata linking MAJEAU and HERNANDEZ to locations where agents believe MAJEAU, HERNANDEZ, WARD, ALVAREZ and their co-conspirators are packaging and distributing illegal drugs. Based on my training and experience and knowledge of this case, I believe that digital devices belonging to MAJEAU, HERNANDEZ, WARD, ALVAREZ and their co-conspirators likely contain additional locational and other data linking the co-conspirators to the Subject Offenses.

151. Drug traffickers also often use vehicles to transport their drugs and may keep stashes of drugs in their vehicles in the event of an unexpected opportunity to sell drugs arises.

152. Drug traffickers commonly keep large sums of currency, financial instruments, precious metals, jewelry, gift cards, and other items of value which represent either the proceeds from drug sales or are intended for the purchase of controlled substances. Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate

on a cash basis.  Such currency is often stored in their residences, stash houses, and vehicles.  To manage, consolidate, store, transport, and otherwise handle such currency, drug traffickers utilize items including money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines.

153. When drug traffickers amass such wealth, they often attempt to legitimize that wealth or otherwise conceal it and its origin from discovery by law enforcement.  To accomplish this, drug traffickers often use different techniques, including the use of digital currency, foreign and domestic banks and their attendant services, including savings and checking accounts, securities, cashier's checks, money drafts and letters of credit to exchange drug proceeds into money that appears to come from a legitimate source.  In my training an experience, amounts of currency (cash) over $2,000 connected to a known drug trafficker, including in their residence and vehicles, are likely to be connected to drug trafficking activities.

154. They also purchase real estate or vehicles and establish shell corporations and business fronts that they use to launder drug proceeds.  Drug traffickers often utilize fictitious or "straw-holder" owners to conceal the true ownership, vehicles, or other valuable items purchased with the proceeds of illicit drug sales.  Indeed, HERNANDEZ has done so here by having another individual register the SUBJECT VEHICLE in their name, when investigators believe HERNANDEZ is the sole

user and owner of the vehicle. In addition, drug traffickers often use wire transfers, cashier's checks, and money orders to pay for drugs or other costs relating to their distribution business. Drug traffickers often keep these items of value, and records relating to them, on their person or in their residences, stash houses, storage units, and/or vehicles where they are concealed from law enforcement and readily available.

155. Drug traffickers go to great lengths to hide and secure the drugs, drug proceeds, other items of value and records relating to their drug business. This is to safeguard those items against robbery and keep them from law enforcement. These secure locations typically include safes, vaults, or other locked containers, as well as specially constructed concealed compartments such as those often found in vehicles used specifically to facilitate drug trafficking. Other methods of concealment include the burial of such items underground, the use of locked vehicles, trailers, out buildings, sheds, and/or exterior closets, the use of natural spaces within walls, furniture, vehicles, and other areas, and the use of sealed cans and canning machines.

156. Drug traffickers often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and money to various points within the United States. They do so, at least in part, due to the convenience of the service and the availability of related internet and phone tracking services, speed of delivery, and to reduce their risk of arrest during the transportation of drugs

from one place to another.  Drug traffickers frequently maintain
records relating to their use of these services, such as
receipts, copies of shipping labels or payment information,
packing tape, packing popcorn/filler and other packaging
materials, and package tracking records printed from the
internet, at their residences, stash houses, and/or in their
vehicles where they are available for reference.

157. Drug traffickers frequently possess firearms,
ammunition, silencers, explosives, incendiary devices, and other
dangerous weapons to protect their profits, supply of drugs, and
persons from others who might attempt to forcibly take such
items and/or harm them during transactions.  Such weapons, which
are often stolen or otherwise possessed illegally, are typically
maintained on their person or in their residences, stash houses,
and/or vehicles where they are concealed from law enforcement
and readily available.

158. Drug traffickers frequently take, or cause to be
taken, photographs and/or videos of themselves, their criminal
associates, their real and personal property, their weapons, and
their drugs.

159. They often use electronic devices such as cellular
telephones -- using digital communications applications such as
iMessage, WhatsApp, Signal, Telegram and the like, satellite
telephones, text messaging devices, telephone calling cards,
computers, email, simple and often prepaid phones, known
colloquially as "drop phones," in order to communicate with
their suppliers, customers, transporters, and others involved in

their illicit drug distribution activities by phone, text message, or email.  Drug traffickers often keep the records listed above on those devices.  Drug traffickers often use multiple phones, including not only their own phones but also phones of family members or significant others in order to avoid detection by law enforcement.  Drug traffickers often keep these devices in their residences, stash houses, businesses, and/or vehicles where they are readily available.

160. From my training and experience, I know that individuals engaged in illegal income producing businesses seek to conceal the income generated from such businesses.  In particular, individuals engaged in money laundering and the other Subject Offenses often conduct their transactions in cash to avoid creating bank records related to such transactions and/or purchase expensive items such as jewelry, gold and silver to conceal the receipt of large amounts of cash.

161. Individuals who amass proceeds from illegal activities routinely attempt to further that conduct and/or conceal the existence and source of their funds by engaging in financial transactions with domestic and foreign institutions, and others, through all manner of financial instruments, including cash, cashier's checks, money drafts, traveler's checks, wire transfers, money orders, etc.  I know from personal knowledge that individuals attempting to conceal income from the government often use a variety of methods to conceal the income including creating false business entities, using known and

unknowing individuals, and hide assets, in order to disguise and conceal income.

162. Based on my training and experience, I also know that those involved in money laundering and the other Subject Offenses usually keep transaction records and other evidence related to their criminal activity at their place of business, residences, inside their vehicles, and on their persons, including their digital devices which are, of course, necessary to complete the cryptocurrency transactions because cryptocurrency does not exist in physical form. Notably, those involved in the Subject Offenses generally maintain and use numerous digital devices and keep those devices (including backup devices in the event that a cell phone or other digital device necessary for the Subject Offenses is seized by law enforcement) at their homes, in the vehicles, and on their persons.

## VI. **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**[13]

163. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

---

[13] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

       d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

   164. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

       a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

       b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

165. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

166. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

167. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

168. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress the holder's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of the holder's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

169. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. **REQUEST FOR AFTER-HOURS SERVICE**

170. I respectfully request that the search warrant permit law enforcement agents to execute the requested search warrants after hours, specifically, in the very early morning hours (prior to 6 a.m.). During this investigation, law enforcement has learned that when HERNANDEZ sleeps overnight at SUBJECT PREMISES 3, he leaves between 5 a.m. and 5:30 a.m. Investigators believe it would be safer to encounter HERNANDEZ at his residence rather than attempt to conduct a traffic stop, which could cause a safety risk to the public if investigators attempt to conduct a traffic stop and HERNANDEZ flees. Additionally, SUBJECT PREMISES 3 is located in a resort area and is adjacent to Angel Stadium. Execution of the search warrant at SUBJECT PREMISES 3 before 6 a.m. will alleviate disturbance to the public and reduce the possibility of law enforcement and/or HERNANDEZ interacting with children walking inside or around the apartment building during school commute hours.

Further, all SUBJECT PREMISES and SUBJECT PERSONS are interconnected. Executing one search warrant earlier than the rest could lead to evidence being destroyed and could cause a safety issue if the SUBJECT PERSONS and those working with them are made aware of law enforcement's execution of a search warrant in one location and anticipate their arrival at other locations. Investigators located several photographs depicting firearms on HERNANDEZ's iCloud account. Additionally, seized text messages from the iCloud account indicate that both HERNANDEZ and MAJEAU own multiple firearms, including the firearm pictured below. Permitting simultaneous execution of the requested search warrants in the early morning hours will reduce the risk of law enforcement countering armed resistance at any of the locations to be searched.



## VIII.    <u>CONCLUSION</u>

For all the reasons described above, there is probable cause to believe that the items listed in Attachments B-1 and B-2, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses, will be found at the premises, persons, and vehicle, described in Attachments A-1 through A-11.

_____
Jaclyn Casaceli, Special Agent
Drug Enforcement
Administration

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone this 23rd day of September, 2024.

_____
HONORABLE KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE